# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, | CIVIL ACTION NO.: |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| YALE UNIVERSITY, MARVIN CHUN, JOHN MAYES, JORDAN PILANT, MARIA PIÑANGO, MARK SOLOMON, JORDON WHITE, ANGELA GLEASON | April 25, 2019 |
| Defendants. | |

## **VERIFIED COMPLAINT**

The Plaintiff, John Doe, a Senior at Yale University, met another Yale University student named Ann Roe1, a Sophomore, on a dating application called Tinder. Before their initial contact on Tinder, neither had met the other on campus or any previous gathering. The couple discussed and shortly thereafter, engaged in consensual sex for approximately ninety minutes. Unfortunately the condom did not last more than 45 minutes and new one had to be applied.

Although the two had met face to face for only a couple of waking hours, Ann has decided to punish John for several past events where she had been sexually assaulted. John now finds himself suspended from Yale

---

1 Ann Roe is a pseudonym

Complaint

University a few short weeks before his graduation date. John has accepted a job offer from the industry leader in his field of study which is contingent upon his graduation. The suspension is until next Spring semester and unless this Court intervenes, he will miss his graduation date in a few weeks along with all of his closest friends and will forever miss the experience of graduating from college with those he has toiled as suffered alongside.

If John is allowed to turn in his final papers, there is virtually no chance he will ever see or interact with Ann ever again. Conversely, if John has to repeat the entire semester next Spring, there is a chance he will have classes in common with Ann thus creating more hardship for both Ann and John. Additionally, a finding of sexual misconduct is a scarlet letter on John's transcript and will effectively crush his chances to obtain the types of employment he has worked hard to gain. All because his condom came off and the group of individuals reviewing his case at Yale University were clearly biased against him as a male that had been accused of not receiving consent for unprotected sex for a few seconds until he put on a new condom. This despite having undisputed testimony from Ann that there was consent for sexual activity immediately before the condom came off and again consent for sexual activity immediately after the condom was replaced. John specifically asked for consent before the unprotected contact and then asked twice in the short time in went on, but Ann disagrees. There was never any allegation that Ann withdrew consent or that John had a reason to believe Ann had not consented to the few seconds of unprotected

sexual intercourse.

John's future literally hangs in the balance of this abhorrent allegation and arbitrary and capricious ruling from Yale's Panel reviewing sexual misconduct that is reminiscent of a modern-day witch trial.

John Doe alleges as follows:

## PARTIES

1.     The Plaintiff, John Doe ("John") is a domiciliary of South Carolina. During the events described herein, John Doe was a student at Yale University and resided in New Haven, Connecticut.

2.     Defendant, Yale University ("Yale") is located with its principal place of operations in New Haven in the State of Connecticut.

3.     Plaintiff is informed and believes and thereupon alleges Defendant MARVIN CHUN, at all times mentioned herein was an individual residing in the State of Connecticut.

4.     Plaintiff is informed and believes and thereupon alleges Defendant JOHN MAYES, all times mentioned herein was an individual residing in the State of Connecticut.

5.     Plaintiff is informed and believes and thereupon alleges Defendant JORDAN PILANT at all times mentioned herein was an individual residing in the State of Connecticut.

6.     Plaintiff is informed and believes and thereupon alleges Defendant MARIA PIÑANGO at all times mentioned herein was an individual

residing in the State of Connecticut.

7.     Plaintiff is informed and believes and thereupon alleges Defendant MARK SOLOMON at all times mentioned herein was an individual residing in the State of Connecticut.

8.     Plaintiff is informed and believes and thereupon alleges Defendant JORDON WHITE, at all times mentioned herein was an individual residing in the State of Connecticut.

9.     Plaintiff is informed and believes and thereupon alleges Defendant ANGELA GLEASON at all times mentioned herein was an individual residing in the State of Connecticut.

10.    Plaintiff is informed and believes and thereupon alleges that Defendants DOES are supervisors, officers and/or staff or students of Yale and are fictitiously named individuals whose true names are unknown at this time to Plaintiff. The true names and capacities of DOES are unknown to Plaintiff, who therefore sue said defendants by such fictitious names and will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and based thereon alleges that each of the fictitiously named defendants are responsible for the acts complained of herein.

11.    At all relevant times herein, each of the Defendants was an agent, servant, or employee of each of the remaining Defendants were at all times acting within the time, purpose or scope of said agency or employment, and were acting with the express or implied knowledge, permission or consent of the remaining Defendants, and each of them. Each of the Defendants held out the other as its authorized representative and each of

the Defendants ratified the conduct of its agents. At all times herein mentioned, DOES were and are Defendants whose identity is unknown at this time who supervised, controlled, or were in some manner responsible for the activities alleged herein and proximately caused Plaintiff's damages.

## JURISDICTION & VENUE

12.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because John Doe and Yale are citizens of different states and the amount in controversy exceeds $240,000.00, exclusive of costs and interest.

13.     This Court has personal jurisdiction over Yale on the grounds that it is a citizen of the State of New Haven, Connecticut.

14.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### Before College

15.     During high school, John was the involved in orchestra and devoted hundreds of hours to developing his musical skills, volunteered helping underprivileged kids and worked to help pay the bills at home.

16.     When applying to colleges, a significant consideration in John's decision process were the extra-curricular programs at each college or university. John decided to pursue admission at Yale because of the quality of the education and its extra-curricular music programs that he had been accustomed to being involved with since he was twelve years old.

17.     In the spring of 2015, Yale offered John admission to the Class of

2019 based on, among other things, his outstanding academic record, SAT

scores, and participation in extracurricular activities, including his high

school music programs. John is now in his final semester of his Senior Year

and has a job offer with the industry leader for his field of study. He has

completed all of his course-work and only needs to turn in his final papers

that can be done via e-mail in all but one of his classes that he must present

directly to the professor. Ann is an underclassmen and all underclassmen

must vacate the Yale University Campus by noon on May 9, 2019. John's

scheduled graduation date is May 22, 2019. John has been suspended and

currently would have to repeat the entire semester next Spring.

18.     John was accepted at other top tier universities, including the Cornell,

Brown, Princeton, and Clemson, but John accepted Yale's offer with the

goal of obtaining a quality education and a competitive position to gain

admission to an elite school.

### John's Yale University Activities

19.     During his time at Yale University, John devoted hundreds of hours

to practicing for Orchestra, A Capella, and Dance groups. He was president

of and founder of several organizations and involved in athletics with the

Yale University.

20.     During his time at Yale University, John suffered severe depression

based primarily upon his feelings he did not belong at Yale because of his

financially impoverished background. A term defined as imposter

syndrome. As part of his tuition, he was covered under a medical provider program at Yale University and regularly saw a psychiatrist and therapist. His level of depression was severe enough to receive accelerated responses from the healthcare providers whenever he called for an appointment.

21.     John had a girlfriend throughout his sophomore and junior year he dated for 18 months and broke up in January 2018. He dated a second girlfriend during the summer months of 2018 for approximately four months and had a one-month relationship in November 2018. After a few weeks of not dating, John decided to try finding a female companion on Tinder.

22.     On December 8, 2018, John began the evening with his friends, first hosting friends at his apartment, where he had one drink. After leaving his apartment, he and a group of friends traveled to several parties. At the first party they were serving punch. John did not drink the punch because he did not know what was in it. Next he went to another party where he had a beer. Finally, John went to LEO, which is a house that was previously used as a fraternity house, located off the Yale University Campus at 35 High Street in New Haven Connecticut and has no affiliation with Yale University in any way, where he had one mixed drink.

**John Doe meets Ann Roe**

23.     John and Ann had started communicating on their smart phones on an application called Snapchat on or about December 7, 2018. They decided to meet in person on the early morning of December 9, 2018 at LEO, Both

arrived at the location at approximately 1:00 A.M. separately, but were unable to locate each other until 1:28 A.M.

24.　John and Ann met at the bar at LEO and decided to leave the party and go back to his apartment at approximately 1:35 A.M.. John did not see Ann drink at LEO.

25.　John's apartment is seven blocks from LEO, and it took 8 to 10 minutes to walk there with Ann. John was sober and coherent and able to move under his own control. Ann was able to move under her own control as well and seemed sober and coherent.

26.　When they arrived at John's apartment at about 1:45 A.M., the couple spoke to each other and played with John's dog in the living room for about fifteen minutes. Thereafter John took his dog out in the front yard for the dog to relieve itself. Ann was approximately 10 feet away standing in John's apartment doorway until the dog finished which took less than two minutes.

27.　John shares a two bedroom apartment with a male roommate. John and Ann went to John's room at about 2:00 A.M. in his apartment and they sat on the bed and spoke for about five minutes.

**John and Ann's sexual encounter of approximately 90 minutes**

28.　John and Ann began kissing and touching each other with their clothes on for about 20 minutes. During the encounter, John asked for consent at each step as the couple progressed from kissing to touching each other with their clothes still on. About seven minutes went by when Ann

Complaint

removed her shirt first, then John removed his shirt as they continued to kiss and touch each other for another five minutes with their shirts off. John moved his hand on Ann's stomach towards the front of Ann's pants and paused before reaching his hand into the front of Ann's pants and said "is this ok?" and she responded "uh-huh" with an accompanying nod indicating consent. John proceeded to touch Ann's vagina and insert his fingers into her vagina. There were no gestures or words spoken by Ann or any physical response from Ann that indicated to John that she did not agree to his contact at any point during their encounter. At the same time, John removed his belt and Ann began rubbing the front of his pants. Approximately two minutes later, Ann reached into the front of John's pants and touched his penis without asking or receiving consent or making any gestures that would otherwise indicate consent from John before she touched his penis. Ann's initial touching was painful to John and he recoiled by pulling his groin area away from her hand. John told Ann that her touching was painful to him, she continued touching his penis with her hands in a less painful way. The two were engaged in touching in this manner for approximately 8 minutes.

29.    John asked Ann if she was interested in having intercourse with him by asking "were you looking to hook-up?", to which she responded "yes" that she was, as she made a veiled reference that was the reason she used Tinder. John then asked "does your definition of hooking-up include sex?" to which she responded "yes it does".

30.     Once Ann consented to intercourse at approximately 2:25 A.M., John went to his dresser and retrieved a condom. As he got up from the bed John removed his pants, underwear and socks and returned to the bed with a condom still in the package. When John returned to the bed, Ann had removed the rest of her clothing and was completely undressed and laying on top of the bedspread.

31.     Upon returning to the bed, John immediately put his condom on and began engaging in intercourse with Ann by laying next to her in a side-by-side position for about 15 minutes and then he shifted to missionary position for about 30 more minutes. John would occasionally withdraw his penis from Ann when John thought he was close to ejaculating in order to extend the sexual encounter. During the time his penis was not inserted he would kiss her on the face and upper body area until he could continue which typically lasted between 45 seconds to a minute before intercourse would continue. At about 3:15 A.M., the condom came off as he withdrew his penis and the condom was partially stuck in Ann's vagina. John told Ann "the condom got stuck" she nodded and acknowledged as John removed the condom by grabbing the portion of the condom that he could see that was outside of Ann's body. John tried to put the condom back on, but he could not. John told Ann "I can't get the condom back on."

32.     John immediately asked Ann "can I continue without it" and Ann said "yes." One he reinserted his penis, he immediately asked "is this OK?" and Ann responded "yes". The period of unprotected sex lasted for less than

10 seconds, during that time John asked again "how does this feel" and Ann responded "good". John was worried that he would soon ejaculate and was very worried about pregnancy and decided he should be wearing a condom, so he stopped, said "just a minute", left the bed, and went to his dresser to retrieve a condom. While looking in his dresser, he located the box of condoms that had several attached to each other with perforations to tear an individual condom away for use. John obtained a new condom and returned to the bed. Once on the bed he put the new condom on and continued vaginal intercourse in the missionary position for an additional 30 minutes, after which he ejaculated into the condom while in Ann's vagina at approximately 3:45 A.M..

33.    After the couple finished having sex, they were catching their breath for about two minutes while on the bed with no covers over them. John then removed his condom while still on the bed and tied a knot at the open end. He then got out of bed, put on his previously removed underwear and went to his bathroom to flush the condom down the toilet. Once in the bathroom he used soap and water to wash his hands and clean his groin area. He urinated and returned to the bedroom still in his underwear. When he returned to the bed, Ann had started dressing and had her undergarments on. John offered her one of his shirts to wear, which she put on.

34.    John asked Ann if she wanted to stay the rest of the night or if she wanted him to get her an Uber to take her back to her apartment. Ann asked to stay the night but had contact lenses she needed to take out. John gave

her contact lens solution and a container to store her lenses until the morning. Ann proceeded to the bathroom for approximately five minutes and later returned to John's bed wearing her underwear and John's shirt.

**The Morning After**

35.    John and Ann discussed their plans in the morning. John had to wake up early to let his dog out and Ann said she had to leave early also. They were both tired and went to sleep at approximately 4:00 A.M. They both woke up at approximately 9:00 A.M. John went to let his dog out but found that she had urinated in her crate. He was cleaning his dog's crate when he saw Ann leaving his bedroom fully dressed and was putting her contact lenses in her eyes in the bathroom. John walked Ann to the door of his apartment, the two hugged and said goodbye and Ann walked out to the street.

36.    John's roommate came into the living room just as Ann was leaving the apartment. John's roommate did not see her, but the roommate told John he saw women's shoes in the living room when he arrived home earlier that morning. John discussed the encounter regarding his condom coming off during sex without identifying Ann and asked if a similar event had ever happened to the roommate. The roommate said it had not happened to him before and believed it to be unusual. John told his roommate that he continued having intercourse for a short time without a condom and then put on a new one. The roommate asked if she was ok with that and John responded yes.

37.    A few minutes after Ann left his apartment, John sent Ann a Snapchat message to Ann stating: "Awk [awkward] question, are you on BC [birth control? Have a nice morning btw [by the way]. Ann's response was "yes! I would tell you ahead of time if I weren't dw [don't worry] also like my family is MAD conservative so that's why I'd rather not have [male] know HAHAHAH."

38.    Although Ann asked John to not tell anyone about their encounter, Ann immediately began texting at least three male friends the same day as the encounter, but she described events that did not happen and she was inconsistent about who removed the condom in her versions. First was Male A at 11:49 A.M., then Male B at 5:04 P.M., Male C at 5:18 P.M. Ann described a different interaction and an act she referred to as getting "stealthed" [male has permission to have protected intercourse but secretly removes the condom before ejaculating during sex]. In her version of events, the condom had not accidentally come off, but she consistently told the three males that she had either removed the condom herself or she saw John remove the condom during an act she described as having performed oral sex on John and stimulated him with his hands (which did not happen because the two were wearing their pants until immediately before engaging in intercourse). She went on to state "he probably thought it was ok since I didn't react badly". She also wrote "confused only…not really upset…but I guess I'm annoyed that I didn't anticipate it and express that I didn't want to." In yet another text, Ann states "I guess I didn't have no[sic]

body language and I didn't say no but I was more like confused."

Male A – (no reference to who removed the condom) Ann stated John wanted manual stimulation of his penis after he finished having sex. She stated she preferred to continue having sex or she preferred to perform oral sex on John but she said he just wanted manual stimulation and it took a very long time.

Male B – (John takes off the condom) Ann stated She was having sex with john and he was wearing a condom when Ann said she "pretty much finished so he took it [the condom] off" and then she performed stimulated John manually and orally. She stated John was rubbing his penis on her

Male C – (Ann takes off condom) Ann stated "I'm not sure if I got stealthed or not" she was very confused and she stated "I'm not sure if that's what happened tho[ugh]". Ann said in this version that she had protected sex with John and then she manually stimulated John "I was using my hand and it [the condom] came off" while she was either performing oral sex or manually stimulating John. She stated John rubbed his penis on her and he inserted it in her vagina without a condom for a short time.

39.    Later in December the John and Ann sent each other approximately 40 Snapchat messages exchanging niceties on several times December 15 and 20, 2018 and never discussed any issue with their encounter form December 9, 2018.

## Mid January Ann informed John that she was uncomfortable about their encounter

40.     After school resumed in January, John reached out to Ann on Snapchat. On January 16, 2019. After a few exchanges regarding the break, Ann brought up the fact that they had had unprotected intercourse. John shared that he had been uncomfortable with the fact that they had had unprotected intercourse. Although he did not articulate what part he was uncomfortable about, he was upset that he took a risk of pregnancy, even though he corrected the situation by getting a new condom, he was worried that he may have caused a pregnancy until she later conformed that she was on birth control. On January 16, 2019, Ann wrote:

> ok since you seem like probably one of the nicest people I've ever met off Tinder I'm going to be honest with you[,] when we hooked up last time I wasn't comfortable with like being penetrated without protection HAHA it like happened briefly but it left me pretty confused[…]I'm not trying to make you feel bad * * * yeah I think like based on how you and I interacted I was mostly confused because you seem to be really nice and harmless *I'm not like mad or gonna like idk [I don't know] try to get you in trouble or anything I was just confused."*

The next day John sent Ann a message about wanting to get some food. Ann responded and stated "also like I'm chill with you in the way that I'm not trying to smear you or anything but I need time to think about how I feel about the situation."

41.     John became concerned about the word "smear" that Ann used and replied "Im a little concerned since you keep mentioning slandering me tbh [to be honest]" Ann responded "I understand your point of view bit I don't

think it's unreasonable for me to be kind of upset ig [I guess]? I just need time to think because like... I've been actually sexually assaulted multiple times and it's kind of stressful for me to go through things like this no matter how it may look from your end"

42.     On information and belief, John alleges Yale University employees convinced Ann to file a formal complaint against John that she otherwise did not contemplate filing.

43.     On January 30, 2019 Ann filed a formal complaint with the Chair of the University Wide Council (UWC) at Yale University, stating in relevant part "I write to file a formal complaint of sexual misconduct against [John Doe]. On December 9th, 2018 at approximately 2am Mr. [Doe] engaged in unprotected sexual intercourse with me without my consent. This incident took place at Mr. [Doe]'s off-campus residence."

44.     On February 1, 2019, the UWC hand delivered a letter to John stating he was under investigation for sexual misconduct. Included within the letter was a restriction "***All UWC hearing participants are expected to keep confidential all aspects of the UWC process***".

45.     John believes that Ann told people of untrue events and also identified John specifically as the individual that she was describing.

46.     On February 5, 2019, The UWC assigned John a UWC Advisor. The Advisor was eventually removed from John's case and a new one was assigned. John met with the first Advisor at the Afro-American Center and they discussed the details of the case as well as the steps to take. John was

extremely uncomfortable because the Advisor did not seem to pay attention or believe him at all and the Advisor was on his cellular phone for most of the meeting. He would tell John "one second" as he sent and read text messages. He would even be laughing while John was telling him intimate details. John called the UWC Secretary and a new Advisor was eventually assigned to the case.

47.     John filed a response to the UWC letter on or about February 6, 2019.

48.     On February 7, 2019, John had a rehearsal for a dance group at Yale University. At the rehearsal, a male student (Male D) who had previously been an acquaintance of John was giving him looks as though the student was disgusted with John all throughout rehearsal. This made John uncomfortable and worried that other students would notice since there were mirrors in the location for the Dance rehearsal. The student avoided John and would constantly look at John with disdain. After rehearsal, John saw the student meet Ann and they would both look back at John with a look of disgust. This made John extremely concerned because the male student never had a problem with John before this date. John believes Ann told the Male D her inaccurate version of events. and that Ann identified John as the individual that was involved.

49.     On February 8, 2019, John had received communications from a UWC Counselor at Yale Mental Health. A session was eventually scheduled for February 22, 2019. The Counselor would not respond to John

for 5 days at a time until John sent another email to remind him. The Counselor also did not confirm John's appointment so he had to constantly reconfirm with him. John met with him once and he ended up relaying John to another therapist. The Counselor never contacted John again despite being a UWC designated counselor for support.

50.     On February 11, 2019, After meeting the Fact Finder for the fact-finding meeting, John went to speak to Anita Sharif-Hyder UWC Secretary, about his issues with defamation by Ann. Ms. Sharif-Hyder mocked John as he was walking in to her office by saying "Your mother obviously raised you well." John tried to ignore her comment and asked about his issues with students becoming hostile towards him and she said that she will make note of it, but that the UWC will not do anything unless there is proof or it gets worse. She said that there is no way to tell if Ann actually told anyone and that they could open an investigation after the UWC procedure if it gets worse. John felt like he was being targeted by students and the UWC would not help him all.

51.     On February 21, 2019, John was visiting time with two male friends of his. During the visit, one of their friends, a female came to the group. They were discussing a outside of the United States. John mentioned that he was interested in attending the trip. The female said that it would not be a good idea since she knew of another female Yale University student that was going on the trip (who was also in John's dance group) that "hated" John. John asked the female why the other female hated him, to which she

responded "Yale is a small campus and things spread around". She said that she was not comfortable telling him and that he should go talk to the girl that hated him if he wanted to know. She also mentioned that she knew of other girls who hated John for the same reason. John normally keeps to himself and was well liked on the Yale University Campus and involved with multiple campus groups and projects before the Spring 2019 Semester. This exchange in the presence of two of John's male friends resulted in those two individuals no longer contacting John which caused him anger, depression, and embarrassment.

52.     John's friends told him that rumors were circulating around about him regarding Ann's comments and that some students have begun to openly express hatred for him on the Yale University campus.

53.     John was severely affected by this emotionally and he went into a state of despair and deepening depression as he began losing friends and people on campus started outwardly exhibit dislike directly to him.

54.     John began drinking heavily in response to his depression and also was prescribed powerful medications to combat his worsening depression.

55.     The UWC appointed a Fact-Finder on February 4, 2019. The Fact Finder interviewed Ann on February 6 and 12, 2019 and John on February 11 and 14, 2019. The Fact Finder interviewed three witnesses provided by Ann (the three males she sent text messages on December 9, 2018) and one witness provided by John (his roommate). The Fact Finder's Report was completed on February 25, 2019.

56.    The Fact Finder did not obtain a detailed time-line of the events from the parties about the sexual encounter in his initial interview. Ann made several statements that were inconsistent with her texts to Males A, B, and C, but the Fact Finder failed to address the inconsistencies in her statements and evidence.

57.    The Fact Finder stated Ann told him the following relevant information:

a. On December 8, Ann was out with her friend Male A. While she was out, Ann had four drinks of hard alcohol, which she poured herself.

b. After they arrived at LEO [off campus], Male A told Ann that he was going home, and she told him that she was going to meet John.

c. Ann and John met at LEO at approximately 1:30 a.m. They talked there for a few minutes and then left and went to his off-campus apartment.

d. Ann reports that she and John staggered their departures from LEO because she did not want the person at the door to see her leave with someone because she knew he had feelings for her.

e. Ann and John walked to John's house. Ann reported that she was not intoxicated. She walked under her own control. After arriving they played with John's dog and then took him for a walk for about 20 minutes.

f. John asked Ann if she had been tested for STI's and she said she had.

g. Shortly thereafter they began kissing. At first, they were kissing while standing up next to the desk in John's room. John had his arms

around Ann. After that, they moved to the bed and got undressed.

h. Ann stated that John asked if she wanted him to perform oral sex on her and she said okay. She said that she also performed oral sex on John.

i. In our initial follow-up call on February 12, I advised Ann that John did not recall having oral sex either way and that he said that was not something he normally did because of the possibility of the transfer of disease. I asked if she could provide any more details about the activity. Ann said that John asked her if she would perform oral sex on him and she said yes. She said that she was moving her head down towards the foot of the bed and John moved her legs so that they were moving towards the head of the bed. She said she asked him why he was doing that, and he said so they could perform oral sex on each other at the same time. Ann said that she had never had anyone want to do that before and she had never engaged in that type of sexual activity, but she was interested in trying. She said they performed oral sex on each other at the same time.

j. Ann stated that initially John asked about each sexual activity that they engaged in, to the effect of "is this okay?" and she would say "yes." At some point, John left the bed and got a condom from his desk. Ann states that John probably asked about having vaginal intercourse before doing that, but she does not remember that exchange.

k. John put the condom on his penis, and they had consensual protected vaginal intercourse. Ann stated that initially, during the vaginal intercourse, Ann was on top of John. They changed positions, so that Ann

was not on top of John. Ann stated that when they changed positions, John put her hand on his penis and seemed to prefer that to vaginal penetration.

l. During our initial follow up call, I advised Ann that John had reported that the condom had come off inside of her and that he had to remove it from her. Ann denied that happened. She stated that after the initial vaginal penetration, she was touching John's penis with her hand and the condom came off. Ann stated that John said he had more condoms if they wanted to have sex again. Ann stopped touching John's penis and they began kissing. John began using his hand to rub his penis on her body, including her genitalia. He did not ask if he could do that, but she was fine with it. While John was doing this, Ann was holding his body with her hands and they were either on their sides facing each other or John was on top of her, but she does not recall which position they were in while John was rubbing his penis against her.

Ann stated that after John rubbed his penis against her for a while, he penetrated Ann with his penis again. However, he did not ask if he could do that before doing so and he did not put a condom on before doing so. Ann stated that it felt like his hand was on his penis when he penetrated her.

m. Ann does not remember how her legs were positioned when John penetrated her. Initially, Ann thought that the penetration was accidental, and that John did not realize he was penetrating her. However, Ann felt John thrust twice, which signaled to her that John knew his penis was in her. After feeling John thrust twice, she stopped kissing him and pulled her

head away from his. There was no oral communication between them about the penetration. John removed his penis after thrusting twice.

n. After John removed his penis, they continued to have consensual sexual contact until John ejaculated. Ann reported that she touched John's penis with her hands and with her mouth during this period of time.

o. In an email to me dated February 13, Ann stated that there was a bottle of lotion in John's room and that she and John discussed using the lotion to assist while she was touching his penis with her hand.

p. In our phone call on February 14, Ann stated that John put lotion on his penis and that Ann touched his penis with her hand after he had done so. However, she reported that the lotion was not an effective lubricant.

q. Ann said that the only nonverbal communications that took place during the time that she and John were engaged in sexual activity involved him putting her hand on his penis and putting her head on his penis.

r. I told Ann that John had reported that he left the bed after the second penetration and obtained a second condom, that he put the condom on and penetrated Ann, and that he ejaculated while he was penetrating her the third time. In response Ann said that John had left the bed after the second penetration to go to the bathroom to urinate, but that he did not get a condom or penetrate her with his penis a third time. Ann said that after John returned to the bed he remained there until after he had ejaculated onto his stomach. Ann reported that after the second penetration she asked John what he wanted her to do and he asked her to touch his penis with her hand.

She stated that it took a 'long time' for John to ejaculate and that when he did ejaculate, he was on his back, she was on her side and that the ejaculate landed on his stomach. Ann recalled that she was very tired by the time that happened.

     s. In an email to me dated February 13, Ann provided the following information:

I said that John had only left the bed once after getting a condom which actually is not true now that I remember more. While I was using my hand he asked me if I liked "tugging it" or something like that and I responded that "I haven't really ever had to do it to be honest." Additionally, I had been using my hand for so long (after the rubbing / unprotected penetration incident he mostly only wanted me to use my hand which would be the only form of sex that was not easily / self lubricated) I was having trouble performing the act due to the dryness and he got up and got lotion from his computer desk (side nearer the bed, opposite to where he first got the condom originally) cabinet.

He said something beforehand like, "Oh, would lotion help?" This would be after he used the restroom I believe, so probably around 3:30-3:40am. Also, after the entire sexual encounter at around 4am he went to clean up in the bathroom.

     t. Ann believes that they discontinued sexual activity around 4 a.m. because they discussed how late it was and John's need to get up at 8 a.m. to walk his dog. Ann stated that John ignored his alarm and that Ann woke

around 9 a.m., got dressed, and went home.

58.     The Fact Finder's Report was 117 pages long and was provided to John on the afternoon of February 26, 2019 along with a notice of the hearing identifying the names of the individuals that were to be on the UWC Panel and the date for the hearing was scheduled for March 5, 2019. The names had vague descriptions of the individuals and it appeared to John that the panel would consist of four men and one woman. In reality, the panel consisted of three women and two men and unbeknownst to John, one of the women was in the same graduating class as Ann. Had John known of the underlying information, about the makeup of the UWC Panel, he would have objected to the UWC Panelists. When John received the Fact Finder's Report, he was still busy attending all of his classes as Spring Break was not until mid March. While attending his classes he had little time and even less assistance to prepare his defense.

59.     On March 5, 2019 the UWC Panel held John's hearing. John was sick and had the flu and he requested an extension for the hearing through his UWC Advisor which was denied. During the hearing, one of the panel members reacted negatively to a comment made early in John's testimony. The panelist murmured something, shook his head vigorously and immediately began writing notes and stared at John with a look of disgust. This intimidated John and made him very nervous. John was accompanied by a UWC Advisor, Ms. Kellett. John asked her if this behavior was typical, to which she responded "they had specific training against doing

that".

60.     The UWC Panel questioned John aggressively and with a demeaning tone, while the questions from the panel towards Ann were very polite and conciliatory. When a very minor discrepancy was detected in John's testimony when compared to the evidence from the Fact Finder's Report, the UWC Panelist aggressively focused on the minor issue and at times asked inappropriate questions. Conversely, when a major discrepancy was identified with Ann's testimony there were no questions regarding her version of events. As an example: John's exchange with Ann in a Snapchat message showed John had stated he had four to five sexual partners. The panel proceeded to determine facts and circumstances about each of the four women John had dated. John had made a comment about a Snapchat message where Ann stated to him that she had been sexually assaulted multiple times in the past, the panel did not ask any questions of Ann regarding this and one of the panelist openly gave John dirty looks and shook his head in disgust at John when he brought up the issue. Another issue was about the drinks each consumed during the evening. While questioning John about the amount of alcohol he had consumed that evening which consisted of 2.5 drinks, the panelists repeatedly asked John the same questions as if to show they either did not believe him, or they were trying to get him to say something inconsistent. Conversely, no questions were asked of Ann about her drinking that evening even though she was under the age of 21 and admitted to drinking four drinks. Two of

the members of the UWC Panel stared at John continually throughout the hearing with a look of disdain. The UWC Panel did not ask any questions of John's sole witness, his roommate, that was present in the apartment with Ann and John on December 9, 2018. Conversely, when Ann was being questioned, she was laughing and the panelists were very cordial with her. When she made statements that were blaringly inconsistent with her testimony they would either not follow-up on the question or Ann would simply state that her memory was hazy and the UWC Panel would move on to another subject without repeatedly asking her questions as they did with John. Moreover, the Panelists specifically referred to her communication with males she sent text messages to that the messages were inconsistent with each other and made several hours after the events. Yet John's only witness, his roommate's, testimony that was consistent with John's version of the events that had never waivered was not even mentioned in the Panel Report.

61.     On March 15, 2019, the UWC Panel issued its report. The Panel Report articulated the requirements of consent from Yale's additional guidance as "Although **consent does not need to be verbal**, verbal communication is the most reliable form of asking for and gauging consent." The panel went on to write in the undisputed facts section

> The parties eventually engaged in *consensual sexual intercourse* while John wore a condom. During the course of this sexual encounter, *the condom came off* of John's penis. He subsequently *briefly reinserted his penis without a condom*. Subsequently, the parties *engaged in additional consensual activities.* The parties then slept together in John's

bed. Ann left John's apartment after waking in the morning.

The Panel Report stated the narrative of Ann included:

> The condom came off during Ann's manual stimulation of
> John (FF, p. 7). Ann elaborated during the hearing that the
> condom bunched up while she was stimulating John. ***She
> wasn't sure who actually removed it***, but said that it had not
> become stuck in Ann's vagina.
> * * *
> At first Ann thought the penetration might have been
> accidental, but after John thrust twice she concluded it was
> intentional. She stopped kissing him, leaned back, and he
> withdrew. There was no verbal communication.

## Inconsistent statements from Ann

62.    It is clear that the Panel Report focused favorably on Ann's

testimony despite the clear differences from her testimony in the Fact

Finder's Report where texts she sent to three Males revealed she told Male

A about the sexual encounter and did not state who removed the condom,

she told Male B that John took off the condom, and she told Male C that

she took off the condom. The Fact Finder failed to document what Males A

& C remembered during his interviews with these particular witnesses

about which party removed the condom. Male B stated John took off the

condom to the Fact Finder.

The Fact Finder interviewed Ann and she stated to him on February 12,

2019 that "She stated that after the initial vaginal penetration, she was

touching John's penis with her hand and the condom came off." This

statement is consistent with what she texted to Male C where she removed

the condom. The UWC Panel Report states "She wasn't sure who actually

removed it [condom]". In contrast, John's version of events remained

consistent throughout all interviews and questioning. The condom came off by itself in Ann's vagina.

63.    There was no finding that Ann made any objectively reasonable communication to John that she did not want to have unprotected sex. The UWC Panel was biased against John and in favor of Ann by favoring Ann's version of events in spite of inconsistent statements made by Ann. Ann's statements made to individuals show she made no physical or verbal statement to John regarding the brief period of unprotected intercourse. Stating in texts to Males A, B and C "he probably thought it was ok since I didn't react badly". She also wrote "confused only...not really upset...but I guess I'm annoyed that I didn't anticipate it and express that I didn't want to." In yet another text, Ann states "I guess I didn't have no[sic] body language and I didn't say no but I was more like confused." The Fact Finder did not question Males A-C about comments Ann made about her verbal or non-verbal communications about the short period of unprotected sex. Ann told the fact finder "After feeling John thrust twice, she stopped kissing him and pulled her head away from his. There was no oral communication between them about the penetration. * * * [Ann] said that the only nonverbal communications that took place during the time that she and John were engaged in sexual activity involved him putting her hand on his penis and putting her head on his penis." The Panel Report made no mention of Ann's testimony at the hearing regarding her non-verbal actions that were inconsistent between what she told the Fact Finder (which the UWC Panel

used in their report) and the texts to Males A-C where she said she made no non-verbal communication at all. John's testimony was unwavering. He explicitly asked for consent to have unprotected intercourse, he asked her two times about continuing while the unprotected sex was happening before he decided to put on a new condom and continue having vaginal intercourse for another 30 minutes before he ejaculated into the condom while it was in Ann's vagina. Additionally, the text immediately after Ann left the apartment between Ann and John was about whether she was on birth control to which Ann responded "yes! I would tell you ahead of time if I weren't dw [don't worry]". Indicating Ann herself admitted to considering a response to whether or not she would have unprotected sex while the two were engaged in sexual activity. The parties initially consented to protected sex as is established throughout the UWC reports. There was never an issue of birth control until the condom had come off and a new discussion arose. Ann confirmed in her text that she would have told John "before" as to whether or not she was on birth control. Ann's inconsistent statement made earlier in time to any of her other statements to individuals is consistent with John's version of events that he asked for consent and received consent to have unprotected sex and Ann would have told him if she was not on birth control before they had unprotected sex. Yet the UWC Panel found that John did not obtain consent despite having explicitly stated there was consent for all activities both before and after the brief period of unprotected intercourse and there was no form of communication that Ann

did not consent to the activity. The UWC Panel disregarded exculpatory statements made by Ann regarding her consent as seen by her text to John the morning of December 9, 2018 and there was no information presented by the panel that shows Ann gave John any indication she did not consent to unprotected sex.

64.    Despite obvious inconsistencies in her statements, the UWC Panel ruled "The panel did not note any significant inconsistencies in [Ann's] various statements or testimony."

65.    Even though there was clear evidentiary support and John did not ever alter his version of events, the UWC Panel ruled "The panel found that inconsistencies in John's narrative reduced its credibility."

66.    The UWC Panel issued a written ruling that on March 15, 2019, that stated "After a careful review of the testimony, the panel finds by a preponderance of evidence that [John] violated Yale's sexual misconduct policy, in the form of **sexual assault**, by engaging in sexual intercourse with Ann without a condom without her consent during an otherwise consensual encounter between the parties." The UWC Panel did not write any recommended penalty in its Report that was signed by John Mayes, Jordan Pilant, Maria Piñango, Mark Solomon, and Jordon White.

67.    John submitted a written response to the UWC Panel Report within three days of receiving the Ruling.

68.    UWC Procedures state "The decision maker will render his or her decision in writing within seven days of receiving the panel's report. (Sec

Complaint

7.1)

69.    Dean Chun's decision was due on March 22, 2019. The decision was

untimely rendered on March 26, 2019, and stated:

> I am writing to convey my decision regarding the sexual
> misconduct complaint brought against [John] on January 30,
> 2019. After carefully reviewing the relevant documents, I
> have decided to accept the panel's findings of fact and the
> following conclusions reached by the panel by a
> preponderance of the evidence: [John] violated Yale's sexual
> misconduct policy, in the form of *sexual assault*, by engaging
> in sexual intercourse with the complainant without a condom
> without her consent during an otherwise consensual encounter
> between the parties.
> I have decided that, as a result of these violations, John should
> be suspended immediately and through the end of the fall term
> of 2019. This penalty takes into account the panel's
> conclusion that John misrepresented his actions by selective
> assertions in support of his narrative.
> Furthermore, John should receive training on sexual consent
> before or immediately upon his return to Yale so that he might
> act in a more responsible manner in the future.
> For the benefit of both parties, the no-contact agreement
> between the parties should remain in effect while they both
> remain affiliated with Yale.

70.    No extension of time was properly noticed per the UWC Procedures

> The UWC Chair may extend a time period for good cause
> such as illness, holidays, the absence of witnesses from
> campus, the complexity of the allegations, or competing
> demands on UWC Members or decision makers. *The parties
> will be informed by the Secretary or UWC Chair if a time
> period is extended,* and the UWC Chair's decision regarding
> extensions will be final. (Sec 7.8)

71.    The Secretary for the UWC sent an e-mail to the parties stating Dean

Chun had requested an extension to respond, but the e-mail did not include

whether the extension had been granted, nor did the e-mail contain the good

cause basis required by the UWC Procedures.

72.    The Secretary of the UWC sent an e-mail to John with the Dean's Decision attached. The body of the e-mail stated he had until March 31, 2019 (Sunday) by noon to appeal the Dean's Decision.

73.    On March 27, 2019, John met with Dean Angela Gleason. She told him that he was not allowed in any Yale building and he had 48 hours to turn in his Yale student identification card.

74.    John informed Dean Gleason that he was an active patient of Yale Mental Health and was prescribed to use the gym regularly to maintain his mental well-being. When he explicitly stated this to her, he asked if his suspension included the suspension of his healthcare and gym membership. Dean Gleason told him he could not use the service or the facilities thus preventing John from seeking psychiatric help when he needed it most.

75.    John suffered and continues to suffer severe depression, anger, physical anguish, humiliation, mental anguish, and emotional and physical distress to the point of not being able to sleep or concentrate properly or interact with other people as he did before he had was suspended.

76.    UWC Procedures allow for 5 days to appeal. Despite the UWC having required an appeal on a Sunday, the time to file the appeal was shortened by 12 hours. Nevertheless, John filed a timely appeal to the Provost of Yale University on March 31, 2019. The Provost has 14 days to respond to the appeal per UWC Procedures Section 7.7. The time periods imposed upon individuals accused of misconduct are too short for any meaningful evidence to be obtained for a proper defense, particularly when

the accused are students that are under a heavy class-load that are now under immense stress.

77.    On April 3, 2019, John filed a Title IX complaint with Yale University alleging discrimination based upon his sex in connection with the UWC investigation and demanded immediate reinstatement as a student.

78.    On April 4, 2019, the Yale University assistant provost Jason A. Killheffer, informed John via e-mail that Yale University would not be investigating his complaint stating "it is my understanding that the UWC case is still in progress, and the UWC's appeal procedures would be the appropriate avenue for you to pursue your concerns".

79.    On April 11, 2019, the UWC Secretary sent an e-mail to John stating "I write to inform you that the Provost has requested, and has been granted, a short extension in rendering his decision on your appeal. You will be informed of the decision by Wednesday, April 17, 2019."

80.    John's counsel Objected to the extension stating "Please provide the relevant authority for the extension, the request from the Provost for the extension, and the response granting the extension."

81.    The UWC did not provide any supporting documentation for the basis of the extension, nor did they provide any documentation regarding an approval by the chair of the UWC.

82.    The Provost untimely denied John's appeal on April 16, 2019.

83.    John's scheduled graduation date is May 22, 2019. He has five

classes, none of which have traditional final exams. He has written essays that are due in two of his classes. An oral presentation in one class. An oral examination in one class and a take-home examination in the last class. John can turn in his final papers via e-mail for four of his classes and he can schedule his final oral presentation and examinations with the professors after underclassmen have left campus on May 9, 2019.

84.     Ann is a sophomore and she lives on campus. She must leave the Yale Campus along with all of the other underclassmen on May 9, 2019. The Seniors can stay through graduation on May 22, 2019. Ann and John have no classes in common this semester, and had not met before December 8, 2018 despite having been at the same campus for over a year before their only physical encounter.

85.     If John is allowed to complete his degree this semester, there is virtually no chance of John and Ann having any interaction at all. If however, John has to return next year to take the same classes, there is a much greater chance the two will have an interaction on campus.

86.     Yale both denied an appeal to the Dean's Decision and also refused to take action on a formal Title IX complaint filed by John. The UWC appeals policy does not permit review on the basis that the panel decision is manifestly contrary to the evidence or arbitrary and capricious.

87.     The UWC Procedures or any other Yale Procedure does not support Yale's conclusion that a panel decision is not subject to review on the basis that it is arbitrary or unsupported by the evidence.

88.   Despite having already invested over three and a half years and over $240,000 in a Yale University education, John is now suspended until at least January 2020.

89.   As part of its admissions packet, Yale provided John with copies of its school policies, including UWC Procedures dated October 2, 2014.

90.   During the 2015-2016 academic year, Yale adopted a revised UWC Procedure dated October 26, 2015.

91.   A non-exhaustive list of Defendants' wrongful actions include the following: Defendants failed to conduct a thorough and impartial investigation; Defendants evidenced a gender bias against Plaintiff as the male accused throughout the investigative and hearing process; Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; Defendants failed to afford Plaintiff the requisite presumption of innocence required by a preponderance of the evidence standard; Defendants unlawfully utilized a different standard of proof for this proceeding as compared to other University student conduct hearings; a lack of due process by not allowing the accused to view the accuser's testimony during the Hearing; a lack of due process by not allowing sufficient time for the accused to prepare a defense; a lack of due process by not allowing the accused to view the accuser's testimony during the Hearing; a lack of due process by not allowing the accused to cross examine witnesses; Defendants erroneous decision of placing the burden of proof on Plaintiff to prove that he had

consent instead of the accuser proving she made it reasonably known that she withdrew already given consent; lack of an official record of the hearing; the failure to properly investigate and collect all available evidence; the improper exclusion of information in the Fact-Finder's report which the hearing panel and decision maker reviewed in making a determination of responsibility; lack of a rationale for the Decision and Sanction; the imposition of an unduly harsh and unwarranted sanction of suspension; failure of the Dean and Provost to render a timely decision on both the UWC Complaint and the resulting appeal. All of these procedural errors, individually and when taken together, unfairly and materially affected the outcome of Plaintiff's case.

92.    As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has been denied the opportunity to continue with his Yale University education, participation in Yale University's 2019 graduation ceremonies, and employment with the industry leading company in the Plaintiff's field of study. The marking of Plaintiff's academic transcript with two semesters of suspension for a violation of student conduct policy will permanently deny Plaintiff educational and career opportunities. Moreover, Plaintiff has been ostracized from his friends and from the campus community, made a social pariah, and forever damaged emotionally by the excruciating and unfair process and the terribly unjust results flowing therefrom. Plaintiff has also sustained damages to his future education and career prospects as a result of the Decision and Sanction.

93.     Plaintiff therefore brings this action to obtain relief based on causes

of action for violations of Title IX of the Education Amendments of 1972,

breach of contract, and other state law causes of action.

**Directives from the Office for Civil Rights**

94.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S.

Department of Education ("DOE") issued a guidance letter to colleges and

universities in the United States, widely known as the "Dear Colleague

Letter" ("DCL"). The letter advised recipients that sexual violence

constitutes sexual harassment within the meaning of Title IX of the

Education Amendments of 1972, 20 U.S.C. §1681 et seq. and its

regulations, and directed schools to "take immediate action to eliminate the

harassment, prevent its recurrence, and address its effects."

95.     On April 29, 2014, OCR issued additional directives to colleges and

universities in the form of a guidance document titled Questions and

Answers on Title IX and Sexual Violence ("Q&A"). Like the DCL, the

Q&A was aimed at addressing educational institutions' sexual misconduct

policies, including the procedures schools "must" have in place "to prevent

sexual violence and resolve complaints" and the elements that "should be

included in a school's procedures for responding to complaints of sexual

violence."

96.     In response to the Q&A, Yale substantially revised its Sexual

Misconduct Policy in August 2015 and UWC Procedures in October 2015.

The new Procedures, as outlined in an email by Yale University President

Peter Salovey, "was to focus on (3) three key issues: the confidentiality of UWC proceedings, the decision-making process and the relationship between findings and sanctions."

97.     According to the Policy and Procedures, both the complainant and the respondent are entitled to certain expectations throughout the process, including, without limitation, the right to:

    a. a trained body (UWC) to answer informal inquiries and fairly and expeditiously address formal complaints;

    b. an impartial fact-finder to assist in the investigation of the allegations;

    c. confidentiality of its proceedings and the information obtained for those proceedings;

    d. Parties and witnesses must provide truthful information in all phases of a UWC proceeding.

98.     Although Yale promised John these (and other) rights, Defendants nevertheless treated Doe in a manner that clearly violated his rights under the Policy, Title IX, and other state laws, as set forth more fully in this Complaint.

99.     Significantly, on September 22, 2017, the OCR rescinded the "2011 Dear Colleague Letter" and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. See, e.g., https://www.ed.gov/news/press-

Complaint

releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

100.   In response, on that same date of September 22, 2017, Yale Title IX Coordinator Stephanie S. Spangler issued a statement, "Based on our initial review, Yale's current policies and practices, which were adopted after broad engagement of the university community, are ***largely consistent*** with the requirements set out in the new guidance. In particular, Yale has no plans to deviate from the evidentiary standards the university now applies to sexual misconduct cases." (emphasis supplied)

101.   In fact, Yale utilized a "clear preponderance" of the evidence standard for all other investigations with the exception of sexual misconduct. In direct contradiction the September 22, 2017 guidelines, Yale used a lower standard, "preponderance" of the evidence for sexual misconduct matters.

102.   The interim guidance and review suggest that the practices in place at Yale at all times relevant to this lawsuit were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings.

103.   The 2011 Dear Colleague letter from the OCR specifically addressed the issue of off campus sexual conduct and required a nexus to an on-campus sexually hostile environment.

> Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because

students often experience the continuing effects of off-campus sexual harassment in the educational setting, ***schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus***. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

104.   On September 22, 2017 the OCR withdrew the 2011 Dear Colleague

Letter and the 2014 Questions and Answers on Title IX and Sexual

Violence. The 2017 Dear Colleague Letter stated in relevant part:

The [2011 Dear Colleague]Letter ***discouraged cross-examination by the parties,*** suggesting that to recognize a right to such cross-examination might violate Title IX. The Letter ***forbade schools from relying on investigations of criminal conduct by law-enforcement*** authorities to resolve Title IX complaints, forcing schools to establish policing and judicial systems while at the same time directing schools to resolve complaints on an expedited basis. The Letter provided that any due-process protections afforded to accused students should not "unnecessarily delay" resolving the charges against them.

Legal commentators have criticized the 2011 Letter and the 2014 Questions and Answers for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness."1 As a result, ***many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."***

The 2011 and 2014 guidance documents may have been well-intentioned, but those documents have ***led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints.*** The guidance has not succeeded in providing clarity for educational institutions or in leading

> institutions to guarantee educational opportunities on the
> equal basis that Title IX requires. Instead, schools face a
> confusing and counterproductive set of regulatory mandates,
> and the objective of regulatory compliance has displaced Title
> IX's goal of educational equity.

105.   Yale University failed to update the pre-2017 UWC Procedures to
correct the portions of the document that deprived the accused of
fundamental due process. The current UWC Procedures are dated October
2015 and contain the same time periods the OCR specified are in violation
of civil rights of the accused. Moreover, Yale UWC Procedures did not
even specify how to properly assess 2011 issues of whether there was a
nexus between off campus activity and on-campus sexually hostile
environments.

**Pressure on Yale to Expel Alleged Perpetrators**

106.   In the wake of the "2011 Dear Colleague Letter", as well as the
additional "2014 Q&A", the DOE commenced numerous investigations into
colleges and universities, with the underlying threat that those not in
compliance stood to lose federal funding.

107.   Federal funding is a major source of income for Yale. The 2016-2017
Yale Annual Financial Report states, "The quality and promise of our
faculty's work continue to attract major funding from the federal
government, which finances 49 percent of research at Yale." And, "The
federal government funded $567 million, or 74%, of 2017 grant and
contract income, in support of Yale's research and training programs.

/ / /

108.  The investigation of colleges and universities to determine
compliance with Title IX was upheld by Catharine Lhamon, Assistant
Secretary for Civil Rights at the U.S. Department of Education, who told a
group of college administrators at a 2014 conference, ""Do not think it's an
empty threat," when she stated that the ultimate punishment for a school
violating Title IX is a complete loss of federal funding.
(https://www.huffingtonpost.com/2014/07/14/funding-campus-rape-
dartmouth-summit_n_5585654.html)

109.  In fact, in March 2011, a group of sixteen (16) Yale students and
alumni filed a federal Title IX complaint against the university, alleging
that it had failed to eliminate a sexually hostile environment. The
investigation has since been resolved, with the DOE not finding Yale in
violation of Title IX, but criticizing some of its previous policies. Under the
settlement, Yale agreed, among other things, to continue to improve and
publicize efforts to prevent and respond to sexual harassment and violence,
implement its new grievance process, and train students and employees. It
marked the first major settlement after the Education Department's letter to
colleges in 2011 signaling stricter enforcement of Title IX.
(https://projects.chronicle.com/titleix/campus/Yale-University)

110.  In response, in 2011 Yale University President, Richard C. Levin
("President Levin"), created the Marshall Committee, a group including
three (3) women and one (1) man, who reviewed Yale's sexual misconduct
policies. The Marshall Committee declared "the UWC will be the sole

channel for pursuing formal complaints against perpetrators." This determination denied the accused the presumption of innocence. This is a clear violation of due process that the 2017 DOE letter sought to remove.

111.  In addition, the Marshall Committee recommended standard penalties so that there would be clear understanding of the consequences of misbehavior. President Levin instructed, "the UWC to apply any and all penalties, including expulsion where warranted" and that the UWC is "setting appropriate precedents...of the disciplinary consequences that result from sexual misconduct."

112.  President Levin promoted the Sexual Harassment and Assault Response and Education Center ("SHARE"), the UWC, and Communication and Consent Counselors (CCE's) as resources for those affected by sexual misconduct. Significantly, at no time was the UWC referred to as a fair and impartial arbiter of allegations of sexual misconduct.

113.  Despite the foregoing, Yale found itself on the receiving end of at least one such investigation by the Department of Education for failure to disclose four (4) forcible sex offenses. In 2013, Yale was fined $165,000 for failure to comply with the Clery Act. Additionally, Yale University has been under OCR investigation for at least two complaints of non-compliance.

114.  The case involving John Doe arose during a critical period at Yale in which the University faced mounting criticism concerning its handling of

allegations of sexual assault.

115.   Specifically, Yale students openly and vocally accused the University of not taking allegations of sexual misconduct seriously enough and of failing to harshly punish perpetrators of sexual assault.

116.   In June 2016, expelled Yale basketball captain, Jack Montague, filed a lawsuit against Yale when "the university strove to make an example of a star athlete to prove they are "indeed tough on men who 'victimize' female students." Yale accused Montague in October 2015 of having non-consensual intercourse with a female student in the fall of 2014. The woman in the Montague case did not file a complaint, and did not allege nonconsensual sex with him; however, Montague [claimed] deputy Title IX coordinator Angela Gleason told the hesitant woman that she was not the first victim to come forward with a sexual misconduct complaint against Montague." (http://reason.com/archives/2017/12/06/yale-holds-transcript-of-former-basketba) Subsequently, this honorable court has ruled on a motion for summary judgment allowing the Montague case to proceed to trial.

117.   As a consequence of the OCR investigations, Clery fine, lawsuits and media scrutiny, Yale was under enormous pressure to show it was willing to take a hard line against students accused of sexual assault in order to dispel the notion that its campus was an unfriendly and unsafe environment.

118.   Yale in its publication, "Preventing and Responding to Sexual Misconduct," encourages and promotes reporting, seriously. "If you have

experienced sexual misconduct of any kind, the University urges you to take action to seek the help and support that you need, which may include making a report and pursuing disciplinary and criminal sanctions."

> a) "Serious situations can often be averted by responding at the first sign of trouble"
>
> b) "Take any signs of reluctance or refusal, including nonverbal signs, very seriously."
>
> c) "Take sexual pressure seriously. Many sexual assaults begin with low-level pressure."
>
> d) "Be alert to patterns, not just isolated actions. Take repeated disrespect intimidation, and threats seriously, even if they seem small alone."
>
> e) "Stalking can sometimes seem merely annoying or even flattering, but its intrusive nature must be taken seriously, whether it is online or in person."
>
> (emphasis supplied)

119.  Yale support services include SHARE which provides information, advocacy, and support for complainants. Complainants are told "Title IX coordinators, the UWC, and the Yale Police Department (YPD) work hard, along with SHARE, to streamline and coordinate complaint processes, so it does not matter where you begin. The options are not mutually exclusive; you can pursue any or all of them as you wish. You will always be part of the decision-making process and the choices regarding whether or how to

proceed are generally up to you."

120.   During the 2014 - 2015 academic year, the SHARE center served 223
students: 189 women and 34 men (15 of the men for "Information").
(http://sharecenter.yale.edu/sites/default/files/files/SHARE%20Center%20
Report%2014-15.pdf)

121.   At 85% female utilizing SHARE to seek services for experiences
with sexual misconduct, it is clear that Yale funded support services which
include SHARE, the Title IX Coordinators and the UWC, to provide
support services primarily to women.

122.   On information and belief, the materials used for training the staff of
SHARE and the UWC are the same, and focused on providing "victim-
centered" response.

123.   When students enter into a Title IX disciplinary matter at Yale, the
institution will provide a vastly disproportionate number of support services
to the complainant, who is female in 85% of cases, based upon the
foregoing data from SHARE.

124.   Even the YPD has a Sensitive Crimes & Support Coordinator, "who
provides services to victims, such as safety planning and assistance in
obtaining a protective order." Upon information and belief, there are no
support services offered by YPD to respondents.

125.   Complainants at Yale have access to University funded SHARE, the
UWC, Title IX Coordinators, and Yale Police Department. Upon
information and belief, no specific University funded resources are offered

at Yale to respondents, who are disproportionately male.

126.   The resources the UWC provided to complainants, who are nearly all female, overlap with UWC adjudication. The UWC clearly allocates more experienced individuals to the females. The advice and counsel complainants receive is from Yale staff who have been trained in UWC decision-making. As a result, complainants are frequently better prepared by Yale staff to present a case before the UWC.

127.   Yale has student organizations, also funded by the university, such as the Communication and Consent Educators (CCE) Program. "We aim to end sexual violence by transforming our corner of contemporary culture into one where respect, mutuality, and mindfulness are the norms." (https://cce.yalecollege.yale.edu.)

128.   Upon information and belief, Defendants actively adopted the Title IX Coordinator's mission of increasing reporting of alleged sexual misconduct at Yale. Unfortunately, the UWC did so at the expense of properly vetting complaints of sexual misconduct to ensure the students who were making the reports did so on a good faith basis and that the conduct was campus sexual misconduct that was associated with a sexually hostile education environment.

/ / /

## COUNT I

## Breach of Contract

## (Yale)

129.   Plaintiff realleges and hereby incorporates by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

130.   As part of its admissions packet, Yale provided John with copies of its school policies, including UWC Procedures dated October 2, 2014.

131.   During the 2015-2016 academic year, Yale adopted a revised UWC Procedure dated October 26, 2015.

132.   Yale failed to revise their UWC Procedures after the Dept of Education issued new Title IX requirements on September 22, 2017.

133.   As a member of the Yale University community, the codes afford John certain rights that are contractual in nature.

134.   Yale breached their contract with John by not following Title IX guidelines for protecting John's civil rights and determining UWC jurisdiction for off-campus sexual activity.

135.   Yale breached their contract with John by determining consent must be verbal or otherwise specifically given despite having no indication that consent had been withdrawn during a sexual encounter.

136.   Yale breached their contract with John by reaching a decision on Ann's complaint that is arbitrary and capricious.

137.   Yale breached their contract with John by refusing to consider whether the panel's decision is arbitrary or unsupported by the evidence.

138.   Yale breached their contract with John by failing to follow the timelines for issuing a decision by the Dean within seven days of receiving the UWC Panel Report.

139.   Yale breached their contract with John by failing to follow the timelines for issuing a decision on appeal by the Provost within fourteen days of receiving an appeal.

140.   Yale breached their contract with John by failing to promptly investigate John's Title IX Complaint for sex based discrimination by the UWC Panel that deprived him an opportunity to receive an education.

141.   Yale breached their contract with John by implementing a Title IX regime that encourages allegations of misconduct, offers accusers robust support and vigorously prosecutes complaints, while affording scant resources to the accused, little or no male perspective on adjudicatory panels, and no avenue for meaningful review of panel decisions.

142.   Yale's incomplete and arbitrary actions breached the codes, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

143.   On March 27, 2019, Yale deprived John of medical services and access to facilities he paid for in advance for the use of the services and facilities through May 22, 2019.

144.   Yale's suspension of John from the University will preclude him from completing his undergraduate degree that he has but weeks to complete.

145.   As a direct and foreseeable consequence of these breaches, John has sustained damages.

146.   Yale's UWC Panel failed to address its lack of jurisdiction over the complaint where the initial filing lacked sufficient information regarding circumstances and events to establish there was any jurisdiction based upon the location of the events alleged by ANN. Additionally, the UWC Panel failed to address exculpatory evidence found in the UWC Report that clearly corroborated John's version of events of receiving consent for unprotected intercourse and simultaneously showed Ann's version of events were impossible.

147.   Yale's implementation of the current UWC adjudicatory process is contrary to John's reasonable expectations.

148.   Yale's decision to suspend John from the University on the basis of Ann's complaint is in violation of John's procedural and substantive contractual rights and reasonable expectations.

149.   Yale's decision to suspend John from the University is capricious and arbitrary.

150.   As a direct and proximate result of the foregoing events of breach, John faces imminent irreparable harm to his education and professional career goals, as well as emotional and reputational harm for which no adequate legal remedy exists. Thus Plaintiff seeks Injunctive Relief from this Honorable Court.

Complaint

## COUNT II

**Violation of Title IX of the Education Amendments of 1972,**

**20 U.S.C. § 1681 et seq.**

**(Yale)**

151.   Plaintiff realleges and hereby incorporates by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

152.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

153.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Yale.

154.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

155.   Plaintiff was innocent and wrongly found to have committed a violation of Defendant Yale's Sexual Misconduct Policy, and gender bias was a motivating factor.

156.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable

resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

157.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

• "Notice . . . of the procedure, including where complaints may be filed";

• "Application of the procedure to complaints alleging [sexual] harassment...";

• "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

• "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

• "Notice to the parties of the outcome of the complaint......"5

158.   Based on the foregoing, Yale failed to conduct an adequate, reliable, and impartial investigation of the complaints.

159.   Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, inter alia:

> a. Yale support services include SHARE: Sexual Harassment and Assault Response and Education Center which provides information, advocacy, and support for complainants. Complainants are told "Title IX coordinators, the UWC, and the YPD work hard, along with SHARE, to streamline and coordinate complaint processes, so it does not matter where you begin. The options are not mutually exclusive;

you can pursue any or all of them as you wish. You will always be part of the decision-making process and the choices regarding whether or how to proceed are generally up to you."

b. 85% of the students utilizing SHARE are females seeking services for experiences with sexual misconduct, it is clear that Yale funded support services which include SHARE, the Title IX Coordinators and the UWC, to provide support services primarily to women. provide a vastly disproportionate number of support services to the complainant, who are female in 85% of cases, based upon the foregoing data from SHARE.

c. Even the Yale Police Department has a Sensitive Crimes & Support Coordinator, "who provides services to victims, such as safety planning and assistance in obtaining a protective order." Upon information and belief, there are no support services offered by YPD to respondents.

d. Complainants at Yale have access to University funded SHARE, the UWC, Title IX Coordinators, and Yale Police Department. Upon information and belief, no specific University funded resources are offered at Yale to respondents, who are disproportionately male.

e. Yale has student organizations, also funded by the university, such as the Communication and Consent Educators (CCE) Program. "We aim to end sexual violence by transforming our corner of contemporary culture into one where respect, mutuality, and mindfulness are the norms." https://cce.yalecollege.yale.edu

f. Upon information and belief, Defendants actively adopted the Title IX Coordinator's mission of increasing reporting of alleged sexual misconduct at Yale. Unfortunately, the UWC did so at the expense of properly vetting complaints of sexual misconduct.

160.    As demonstrated above, it is apparent that Yale view all women who simply make complaints of alleged sexual misconduct, as "victims". This attitude and policy implementation clearly leads to gender bias against males. The Association of Title IX Administrators published "2014 Whitepaper" entitled *Equity is Such a Lonely Word*, includes training materials presented to college Title IX departments and states: "victims

have historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum to right the historical imbalance." Upon information and belief, Yale University was a recipient of these training materials.

161. Yale's policies and procedures discriminated against Plaintiff on the basis of his sex and led to an erroneous outcome. Contrary to the Question and Answers published by the United States Department of Education, Office for Civil Rights in September of 2017, Yale improperly utilized a "preponderance of the evidence" standard in adjudicating Plaintiff's responsibility,

> Question 8:
> What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?
>
> Answer:
> The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.
>
> The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases

of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

162.   As evidenced by Yale's Spring 2016 Executive Committee's Report,

Yale University utilized a "clear preponderance" of the evidence standard

for other disciplinary proceeding other than sexual misconduct cases,

indicating a level of proof that lies above preponderance but below clear

and convincing.

https://www.yale.edu/search/google/Clear%20preponderance

163.   Yale's UWC's policy 7.5 states as follows:

**7.5. Findings, Conclusions, and Recommendations**
Following the hearing, the panel will consider whether the respondent has violated University policy, giving an affirmative answer if it is satisfied that a violation **has been shown by a preponderance of the evidence.** (Emphasis added).

164.   The fact that Defendants implemented a lower burden of proof in

sexual misconduct cases is in direct line with the University's stated policy

to ignore and defy the 2017 OCR's recommendations and stated guidance.

165.   Yale failed to conduct an adequate, reliable, and impartial

investigation when it conducted its investigation of Ann's allegations and

subsequent adjudication in a manner that was biased against John.

166.   Yale made no provision, to John as the respondent, to cross examine his accuser at the hearing, and thus John was severely prejudiced in being able to defend himself.

167.   As discussed above, Yale have created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt and improperly places the burden of proof upon John to prove his innocence. Such a one-sided process deprived John, as a male student, of educational opportunities at Defendant Yale on the basis of his sex.

168.   On information and belief, all students that have been suspended and expelled from Yale for sexual misconduct have been male.

169.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

170.   This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

171.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

Complaint

## COUNT III.

## Negligent Infliction of Emotional Distress

### (All Defendants)

172.   Plaintiff realleges and hereby incorporates by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

173.   When Defendants undertake to investigate allegations of sexual and other misconduct against one of its students, it owes that student a duty to protect him from foreseeable harm.

174.   By participating in the Disciplinary Action, John reasonably relied upon defendants' duty to protect him from harm.

175.   For all the reasons above, Defendants breached their duties of reasonable care.

176.   As a result, John has suffered physical harm, including severe emotional distress.

177.   A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

178.   As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

/ / /

Complaint

## COUNT IV.

## Intentional Infliction of Emotional Distress

## (Yale)

179.   Plaintiff realleges and hereby incorporates by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

180.   Yale suspended John from Yale University and explicitly told him that effective on that same day, he no longer had access to his healthcare that included psychiatric treatment.

181.   John had been a patient of Yale Mental Health for over a year and was on strong medications to battle his depression before the allegation was made by Ann and his medications increased after the UWC investigation commenced. 175. Yale were informed by John that students were openly hostile to him as a result of allegedly hearing Ann's version of events, but Yale did nothing in response.

182.   Yale's conduct in suspending John without adequate evidence or jurisdiction, not helping him during a proceeding that required confidentiality amongst all claimants, which included Ann despite her disclosure of facts to others in violation of UWC Procedures caused John the most severe emotional distress in his life at a time he should be liking forward to graduating college with his friends. Yale conduct in causing this stress and then removing psychiatric care when John needed it most is outrageous and has no place in modern society.

183.   John informed Dean Angela Gleason that he was in treatment for

psychiatric issues and he specifically asked the day after he was suspended if he could continue to see his doctor and he was told no by Dean Gleason. Yale's denial of medical services that had already paid for by John's tuition for the entire semester was cut-off on March 27, 2019 at a time when he needed it more than ever before. Yale's knowledge of his need for treatment and also that he had just been suspended from school was either intentionally done and thus outrageous or clearly reckless conduct.

184.   John suffered severe emotional distress and began drinking heavily to combat his ever-spiraling descent into a deep depression, embarrassment, shame, feelings of inadequacy, betrayal, helplessness. He could not sleep, communicate with others and became a recluse.

185.   Yale's conduct caused severe emotional distress, in that Plaintiff feels as though he has had his education and potential for a job wrongfully torn from him by the Defendants with no justification or cause. This caused Plaintiff to feel haunted by the potential of losing his entire future despite having done nothing wrong. Furthermore, the distress of knowing that Defendants are repeatedly violating his rights has caused severe distress.

186.   Defendants' conduct was intentional and reckless when he was deprived of medical care immediately after being suspended. When Plaintiff realized he was not graduating from Yale in May 2019, he suffered pain, physical anguish, humiliation, mental anguish, and emotional and physical distress to the point of not being able to sleep or concentrate properly or interact with other people as he did before he was accused by

Ann.

187.   Plaintiff has suffered and continues to suffer extensive humiliation, mental anguish and emotional and physical distress and has no reasonable method to receive adequate treatment.

188.   After Yale had deprived John of his education, they also engaged intentional in intentional acts that excluded him from desperately needed psychiatric treatments, knowing that he had been using them and currently needed treatment. Such actions were unprivileged and intended to cause severe emotional distress to Plaintiff and in fact did cause severe emotional distress to Plaintiff.

189.   Yale actions were willful, malicious and oppressive and in conscious disregard for Plaintiff's rights and well-being, and were committed by Yale University through Dean Angela Gleason on March 27, 2019, with the full knowledge, consent and/or ratification of Yale University. Therefore such conduct by Defendants and Doe's warrants the imposition of punitive damages.

### COUNT V.

### Defamation – Libel Per Se

### (All Defendants)

190.   Plaintiff realleges and hereby incorporates by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

191.   All named Defendants  prepared and electronically signed a written

UWC Panel Report that stated John had sexually assaulted Ann. Sexual Assault is a crime in the State of Connecticut.

192. The UWC Panel Report was a written document and was transmitted electronically to several individuals.

193. Dean Marvin Chun issued a Dean's Decision letter that stated John had sexually assaulted Ann.

194. The Dean's Decision letter was a written document and was transmitted electronically to several individuals.

195. All recipients of the UWC Panel Report and the Dean's Decision letter reasonably understood that the statement about the sexual assault of Ann was committed by John.

196. The writings stating that John sexually assaulted Ann were defamatory to John and diminished his reputation in the community at large and identified him as a sexual predator to reasonable persons that viewed the document.

197. The creation and distribution of the UWC Panel Report and the Dean's Decision stating that John had committed a crime caused damages to John, the amount of which is to be proven at trial.

/ / /

## COUNT VI.

### Estoppel and Reliance

### (All Defendants)

198.   Plaintiff realleges and hereby incorporates by reference the allegations contained in all other paragraphs, inclusive, of this Complaint.

199.   Yale's various policies constitute representations and promises that Yale should have reasonably expected to induce action or forbearance by Plaintiff.

200.   Yale expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Yale would not tolerate, and Plaintiff would not suffer, discrimination or harassment by fellow students or faculty members and would not deny Plaintiff his procedural rights should he be accused of a violation of Yale's policies.

201.   Plaintiff relied to his detriment on these express and implied promises and representations made by Yale, by choosing to attend Yale rather than other schools of equal caliber and paying the required tuition and fees.

202.   Based on the foregoing, Defendants are liable to Plaintiff based on Estoppel.

203.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential

Complaint

damages.

204.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.



**WHEREFORE**, the Plaintiff, John Doe, requests that the Court:

a) Restrain and enjoin the Defendant, Yale University, from implementing John's suspension;

b) Restrain and enjoin the Defendant, Yale University, from denying John the

opportunities and benefits afforded undergraduate students;

c) Restrain and enjoin the Defendant, Yale University, from further adjudicating Title IX complaints under the current process;

d) Award John damages for breach of contract in an amount exceeding $75,000, to be proven at trial;

e) Award a judgment in favor of Plaintiff for damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

e) Award punitive damages for intentionally inflicting emotional distress upon John;

f) A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i)

Complaint

the outcome and findings made by Yale should be reversed; (ii) Plaintiff immediately reinstated as a student in good standing and permitted to complete his final classes to graduate in the May 2019 semester (iii) Plaintiff's reputation should be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; and (vi) any record of the complaint against Plaintiff be permanently destroyed; and

g) Award Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated at New Haven, Connecticut this 24th day of April, 2019.

THE PLAINTIFF

/s/ Jonathan J. Einhorn

JONATHAN J. EINHORN
129 WHITNEY A VENUE
NEW HAVEN, CONNECTICUT
06510
FEDERAL BAR ct 00163
einhornlawoffice@gmail.com
203-777-3777

/s/ Jorge I. Hernandez

JORGE I. HERNANDEZ, Esq.
823 ANCHORAGE PLACE
CHULA VISTA, CA 91914

Complaint

(pro hac vice admission pending)
Jorge@JIHLAW.com
619-475-6677

## **VERIFICATION**

I hereby verify that the matters and facts stated in this complaint are true
and accurate.

Dated: New Haven Connecticut, April 24, 2019.

_____
John Doe

John Doe

C:\DOCS\JIHLAW\Clients\19S\19-17\19-17-0001\P-Pleadings\190425 Complaint Doe v. Yale.doc

Complaint