Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | Language Assistance ▾

(/)

## U.S. Department of Education (/)

Search...

**ARCHIVED INFORMATION**

# Department of Education Issues New Interim Guidance on Campus Sexual Misconduct

***New Q&A will serve as interim guide until the conclusion of notice and comment rulemaking***
***Widely criticized 2011, 2014 guidance also withdrawn***

SEPTEMBER 22, 2017

**Contact:**  Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

**Washington** — Building on her remarks from September 7, 2017, regarding the Department's commitment to protecting all students from discrimination, today U.S. Secretary of Education Betsy DeVos announced the release of a new interim Q&A (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) for schools on how to investigate and adjudicate allegations of campus sexual misconduct under federal law.

"This interim guidance will help schools as they work to combat sexual misconduct and will treat all students fairly," said DeVos. "Schools must continue to confront these horrific crimes and behaviors head-on. There will be no more sweeping them under the rug. But the process also must be fair and impartial, giving everyone more confidence in its outcomes."

In the coming months, the Department intends to engage in rulemaking on Title IX responsibilities arising from complaints of sexual misconduct. The Department will solicit comments from stakeholders and the public during the rulemaking process, a legal procedure the prior administration ignored.

In the interim, the newly-released Q&A (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) on Campus Sexual Misconduct explains the Department's current expectations of schools, and the Department will continue to rely on its Revised Sexual Harassment Guidance, which was informed by a public comment process and issued in 2001, as well as the Dear Colleague Letter on Sexual Harassment issued on January 25, 2006.

"In the coming months, hearing from survivors, campus administrators, parents, students and experts on sexual misconduct will be vital as we work to create a thoughtful rule that will benefit students for years to come. We also will continue to work with schools and community leaders to better address preventing sexual misconduct through education and early intervention," DeVos added.

The Department of Education is also withdrawing (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf) the Dear Colleague Letter on Sexual Violence dated April 4, 2011, and the Questions and Answers on Title IX Sexual Violence dated April 29, 2014. The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness.

DeVos concluded, "As I said earlier this month, the era of rule by letter is over. The Department of Education will follow the proper legal procedures to craft a new Title IX regulation that better serves students and schools."

**Press Call Information:**

The Department will hold a background press call at 10:45 a.m. open to credentialed members of the media. Media interested in participating should RSVP to press@ed.gov (mailto:press@ed.gov) to receive additional information.

## FAQs on Updated Campus Sexual Misconduct Guidance

**What is the purpose of the Q&A on Campus Sexual Misconduct?**

- Describes a school's responsibility to address sexual misconduct complaints
- Discusses the relationship between Title IX and the Clery Act
- Provides examples of interim measures that may be appropriate under the circumstances
- Summarizes what procedures a school should follow to adjudicate a finding of responsibility for sexual misconduct
- Describes what constitutes an "equitable" investigation
- Explains a school's obligations concerning appeals
- Clarifies appropriate evidentiary standards
- Informs schools of their responsibilities concerning notifications to parties of the outcomes of disciplinary proceedings

**What are a school's obligations under Title IX regarding sexual misconduct?**

- Schools must address sexual misconduct that is severe, persistent or pervasive.
- Schools must conduct a fair and impartial investigation in a timely manner.
- Title IX investigations must be led by a person free of actual or reasonably perceived conflicts of interest and biases.
- Schools must designate a Title IX Coordinator.

**Do schools have flexibility to establish fair procedures?**

- Schools have the discretion to apply either the preponderance of the evidence standard or the clear and convincing evidence standard.
- Schools are not required to allow appeals; however, a school may choose to allow appeals solely by the responding party or by both parties.
- Schools may permit an informal resolution, such as mediation, if it is appropriate and if all parties voluntarily agree.
- Schools should provide written notice to the responding party of the allegations, including sufficient details and with adequate time to prepare a response before any initial interview.
- OCR recommends schools provide concurrent, written notice of the outcome of disciplinary proceedings to the reporting and responding parties.

**Does the rescission letter or the Q&A add legal requirements?**

The rescission letter and Q&A do not add requirements to applicable law.

**Does the rescission letter or the Q&A limit the right of a person to file a Title IX complaint?**

No. A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct. Moreover, whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately. In particular, when sexual misconduct is so severe, persistent or pervasive as to deny or limit a student's ability to participate in or benefit from the recipient's school's programs or activities, a hostile environment exists and the school must respond.

**How can I get help from OCR?**

OCR offers technical assistance to help schools achieve voluntary compliance with the civil rights laws it enforces



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

September 22, 2017

Dear Colleague:

The purpose of this letter is to inform you that the Department of Education is withdrawing the statements of policy and guidance reflected in the following documents:

- Dear Colleague Letter on Sexual Violence, issued by the Office for Civil Rights at the U.S. Department of Education, dated April 4, 2011.

- Questions and Answers on Title IX and Sexual Violence, issued by the Office for Civil Rights at the U.S. Department of Education, dated April 29, 2014.

These guidance documents interpreted Title IX to impose new mandates related to the procedures by which educational institutions investigate, adjudicate, and resolve allegations of student-on-student sexual misconduct.  The 2011 Dear Colleague Letter required schools to adopt a minimal standard of proof—the preponderance-of-the-evidence standard—in administering student discipline, even though many schools had traditionally employed a higher clear-and-convincing-evidence standard.  The Letter insisted that schools with an appeals process allow complainants to appeal not-guilty findings, even though many schools had previously followed procedures reserving appeal for accused students.  The Letter discouraged cross-examination by the parties, suggesting that to recognize a right to such cross-examination might violate Title IX.  The Letter forbade schools from relying on investigations of criminal conduct by law-enforcement authorities to resolve Title IX complaints, forcing schools to establish policing and judicial systems while at the same time directing schools to resolve complaints on an expedited basis.  The Letter provided that any due-process protections afforded to accused students should not "unnecessarily delay" resolving the charges against them.

Legal commentators have criticized the 2011 Letter and the 2014 Questions and Answers for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness."[1]  As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[2]

The 2011 and 2014 guidance documents may have been well-intentioned, but those documents have

---

[1] Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J. ONLINE (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty).

[2] *Rethink Harvard's Sexual Harassment Policy*, BOSTON GLOBE (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty); *see also* ABA CRIMINAL JUSTICE SECTION TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS, RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT (2017); AMERICAN COLLEGE OF TRIAL LAWYERS, TASK FORCE ON THE RESPONSE OF UNIVERSITIES AND COLLEGES TO ALLEGATIONS OF SEXUAL VIOLENCE, WHITE PAPER ON CAMPUS SEXUAL ASSAULT INVESTIGATIONS (2017).

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-1100
www.ed.gov

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints.  The guidance has not succeeded in providing clarity for educational institutions or in leading institutions to guarantee educational opportunities on the equal basis that Title IX requires.  Instead, schools face a confusing and counterproductive set of regulatory mandates, and the objective of regulatory compliance has displaced Title IX's goal of educational equity.

The Department imposed these regulatory burdens without affording notice and the opportunity for public comment.  Under these circumstances, the Department has decided to withdraw the above-referenced guidance documents in order to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits.  The Department intends to implement such a policy through a rulemaking process that responds to public comment.  The Department will not rely on the withdrawn documents in its enforcement of Title IX.

The Department refers you to the *Q&A on Campus Sexual Misconduct*, issued contemporaneously with this letter, and will continue to rely on its *Revised Sexual Harassment Guidance*, which was informed by a notice-and-comment process and issued in 2001,[3] as well as the reaffirmation of that *Guidance* in the Dear Colleague Letter on Sexual Harassment issued January 25, 2006.[4]  As always, the Department's enforcement efforts proceed from Title IX itself[5] and its implementing regulations.[6]

In the forty-five years since the passage of Title IX, we have seen remarkable progress toward an educational environment free of sex discrimination.  That progress resulted in large part from the vigorous enforcement of Title IX by the Office for Civil Rights at the Department of Education.  The Department remains committed to enforcing these critical protections and intends to do so consistent with its mission under Title IX to protect fair and equitable access to education.

The Department has determined that this letter is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This letter does not add requirements to applicable law.[7]

Sincerely,

/s/
Candice Jackson
Acting Assistant Secretary for Civil Rights
U.S. Department of Education

---

[3] The *Revised Sexual Harassment Guidance* is available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.
[4] The 2006 Dear Colleague Letter is available at https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.
[5] 20 U.S.C. §§ 1681-88.
[6] 34 C.F.R. § 106.1 *et seq.*; *see also* 34 C.F.R. § 668.46(k) (implementing requirements of the Violence Against Women Act).
[7] If you have questions or are interested in commenting on this letter, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

**September 2017**

**Q&A on Campus Sexual Misconduct**

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

**SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT**

Question 1:

What is the nature of a school's responsibility to address sexual misconduct?

Answer:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[2] 2001 Guidance at (VII).

[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

## THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

## INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

### GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).

[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").

[12] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).

[13] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k)(3)(i)(A).

Answer:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

### INFORMAL RESOLUTIONS OF COMPLAINTS

Question 7:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

Answer:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); *see also* 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

## DECISION-MAKING AS TO RESPONSIBILITY

Question 8:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

Answer:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.

[22] 34 C.F.R. § 668.46(k)(2)(iii).

[23] 34 C.F.R. § 668.46(k)(2)(iv).

## DECISION-MAKING AS TO DISCIPLINARY SANCTIONS

<u>Question 9</u>:

What procedures should a school follow to impose a disciplinary sanction against a student found responsible for a sexual misconduct violation?

<u>Answer</u>:

The decision-maker as to any disciplinary sanction imposed after a finding of responsibility may be the same or different from the decision-maker who made the finding of responsibility. Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.[24] In its annual security report, a postsecondary institution must list all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking.[25]

## NOTICE OF OUTCOME AND APPEALS

<u>Question 10</u>:

What information should be provided to the parties to notify them of the outcome?

<u>Answer</u>:

OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final.[26] This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[27] For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.[28] In an elementary or secondary school, the notice should be provided to the parents of students under the age of 18 and directly to students who are 18 years of age or older.[29]

---

[24] 34 C.F.R. § 106.8(b); 2001 Guidance at (VII)(A).

[25] 34 C.F.R. § 668.46(k)(1)(iii).

[26] 34 C.F.R. § 668.46(k)(2)(v). The Clery Act applies to proceedings arising from allegations of dating violence, domestic violence, sexual assault, and stalking.

[27] 34 C.F.R. § 668.46(k)(3)(iv).

[28] A sanction that directly relates to the reporting party would include, for example, an order that the responding party stay away from the reporting party. *See* 2001 Guidance at vii n.3. This limitation allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act. *See* 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13).

[29] 20 U.S.C. § 1232g(d).

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

**EXISTING RESOLUTION AGREEMENTS**

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

*Note:* The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").