# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN DOE,

                Plaintiff,

      v.

YALE UNIVERSITY, ET AL

              Defendants.

Case No.:  3:19-cv-00620(AWT)

MAY 2, 2019

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

The defendants respectfully submit this memorandum of law in opposition to Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction dated April 25, 2019. (Doc. No. 4.)

## I.      Preliminary Statement

This Court need not hold any evidentiary hearing in this matter at all, nor does the Court need to make any decision as to the plaintiff's claim of irreparable harm.  Due to the plaintiff's delay in filing the present motion, the Court simply cannot award relief in time to make it meaningful.  As will be explained in detail below, the plaintiff cannot at this late date complete his academic requirements for the current academic semester, even if the Court were to order Yale to rescind the suspension at the present time.  The reason for this is that the plaintiff, having been suspended on March 26, 2019, missed the final five weeks of a 13 week semester, i.e. 40% of the class sessions.  At the request of plaintiff's counsel, oral argument on the Request for Temporary Restraining Order will be held on May 3.  The exam period ends on May 8, and final

grades must be in by May 10 in order for any student to graduate. Commencement will be held on May 20.

The plaintiff is enrolled in five courses during the current semester, and he needs the credits from all of them in order to fulfill the requirements for graduation.  As will be discussed below, he has already missed the deadlines for completing assignments in several of his courses. In one course he has missed 65 percent of the course requirements.  In that course, the final assignment, which is in the nature of a take home exam, was due on April 26, 2019.  That course requires an oral exam, which is required prior to the final written assignment.  Furthermore, the plaintiff's suggestion that he can complete all of the outstanding assignments after having missed 40 percent of the class sessions would suggest that the class sessions are superfluous to the educational process.[1]

It should be noted that the plaintiff and his counsel were aware of all of the arguments they made in this action as of March 26, when the plaintiff was suspended.  Indeed, on April 3, 2019, the plaintiff filed a Title IX complaint seeking immediate reinstatement.  (Ex. A.)  In that complaint, the plaintiff makes virtually the same arguments he has made in the present motion. If the plaintiff had made a timely application for injunctive relief by filing his complaint immediately after his suspension on March 26, 2019 and then seeking an immediate hearing, there would have been time for the Court to conduct a complete hearing and make a decision based on evidence from both sides.  It is hard to escape the conclusion that the plaintiff's decision to delay filing the complaint and then to delay even further by seeking a hearing on his motion more than a week later was the result of plaintiff's calculation that a full hearing at which

---

[1]In the event that a hearing is required, the defendant will offer testimony that the standard practice at Yale University for undergraduate students who miss two full weeks of classes is to have them repeat the courses in which they are enrolled for that semester.

all evidence is aired would end in failure.  Thus, the plaintiff appears to have intentionally delayed any hearing on his application for temporary restraining order until such time as it would be impossible for the Court to hear evidence, with the plaintiff apparently believing that the Court might enter the order simply because there was not sufficient time to conduct a hearing before it was too late for the plaintiff to complete his academic requirements this semester.

If an evidentiary hearing is required in this matter, the defendant will provide evidence to establish that the plaintiff simply cannot complete his requirements for the current semester.  The oral argument on the plaintiff's Motion for Temporary Restraining Order has been scheduled for Friday, May 3, at 3:30 in the afternoon. Even if the Court were to grant the temporary restraining order that afternoon, that would leave three business days before the end of exams.  There is no prospect that the plaintiff could complete his requirements in that time frame; indeed, many of the deadlines for those requirements have passed.  Accordingly, since the entry of a temporary restraining order or a preliminary injunction would be futile, the Court can, and should, deny the application for injunctive relief without any evidentiary hearing and without even considering reaching any other issue.

## II.    <u>Factual Background</u>

This action arises out of the two-semester suspension of the plaintiff after Yale's University-Wide Committee on Sexual Misconduct ("UWC") concluded that he had violated Yale's Sexual Misconduct Policies.  The essence of the complaint, filed with the UWC on January 30, 2019, was that the plaintiff, ███████████ student, had engaged in unprotected sexual intercourse with Anne Roe, ████████████ student, without her consent on December 9, 2018.  (Ex. B.)

The plaintiff and Ms. Roe initially connected via an application known as "Tinder" on December 6, 2018.  They communicated over this application for a few days and then agreed to meet in person.  On Sunday, December 9, 2018 at approximately 1:30 a.m., the plaintiff and Ms. Roe met at a party hosted by LEO, an organization comprised of Yale students.   Shortly thereafter, they walked to the plaintiff's off-campus residence with the intention of engaging in sexual intercourse.  (Ex. C, p. 2.)  Prior to engaging in any sexual activity, the plaintiff and Ms. Roe discussed their sexual health, specifically sexually transmitted infections ("STI").  They then began kissing, which advanced to performing oral sex on each other.  During this part of the encounter, the plaintiff, consistent with Yale's Sexual Misconduct Policies, asked Ms. Roe whether each sexual activity was "okay," and Ms. Roe replied "yes."  (Ex. C, p. 7.)

The plaintiff and Ms. Roe then engaged in consensual sexual intercourse during which the plaintiff wore a condom, as contemplated in advance by both individuals.  After engaging in protected sexual intercourse, Ms. Roe began to manually stimulate the plaintiff's penis with her hand.  While she was doing so, the condom bunched up so that it was ineffective; therefore it was removed. The plaintiff and Ms. Roe began kissing again, and the plaintiff again penetrated Ms. Roe's vagina with his penis.  However, he did not ask Ms. Roe's permission to do so and did not put on a condom.[2]  Once Ms. Roe realized that he had penetrated her without wearing a condom, she stopped kissing him and pulled away.  The plaintiff then withdrew his penis.  Ms. Roe was surprised and confused by Mr. Doe's sudden, unannounced decision to engage in unprotected intercourse, which was contrary to the consent she had given.  She had developed a positive impression of the plaintiff, and at the moment that it occurred, she made an assumption

---

[2] Nonconsensual unprotected intercourse during consensual protected intercourse is referred to as "stealthing."  This practice is harmful to victims because victims fear unwanted pregnancies and the contraction of sexually transmitted infections.   In addition, "stealthing" is a clear violation of victims' bodily autonomy and the trust they had mistakenly placed in their sexual partner.  See Alexandra Brodsky, *Rape-Adjacent: Imagining Legal Responses to Nonconsensual Condom Removal*, 2017 Colum. J. Gender & L. 183, 186 (2017).

that perhaps he just made a mistake.  Thereafter, Ms. Roe continued to engage in consensual sexual activity with the plaintiff, but there was no more intercourse. Ms. Roe spent the night with the plaintiff and left in the morning.  (Ex. C, p. 7-8.)

When she returned to Yale after the winter break, Ms. Roe communicated with the plaintiff regarding her concerns about their December 9, 2018 sexual encounter.  When Ms. Roe indicated that she was not comfortable with being penetrated without protection, the plaintiff agreed that that conduct was "strictly not okay," and he did not know if he was "drunk or something" caused him to engage in that behavior.  (Ex. C, p. 3-4.)  He did not suggest at that time, as he does now, that he had asked for her verbal consent to unprotected intercourse and that she had agreed.  Ms. Roe filed a formal complaint with the UWC two weeks later on January 30, 2019 alleging that the plaintiff had engaged in unprotected sexual intercourse with her without her consent.  (Ex. B.)

Ms. Roe's complaint was adjudicated pursuant to Yale's procedures governing the UWC.  See, Ex. D.  The disciplinary process provided a very comprehensive investigation and hearing.  It began with an investigation by an impartial fact-finder who interviewed both the plaintiff and the complainant, as well as four other witnesses.  The investigation also included a collection of a large number of documents.  Ultimately the Fact Finder produced a comprehensive report consisting of 20 pages, along with 10 exhibits, which spanned another 97 pages.  (Ex. C.)  The next step in the process was to convene a hearing on March 5, 2019 before a UWC panel consisting of five members.  Prior to the hearing, the panel members digested the Fact Finder's report and exhibits.  The parties testified before the five member panel at the hearing.  Both parties were allowed to, and did, make opening statements, after which they were questioned by

the panel members.  (Ex. E, F.)  In addition, the parties were each allowed to ask questions of the other by submitting the questions to the panel chair, who then inquired of the party.

At the conclusion of that hearing, the panel deliberated among themselves over four separate sessions.  At the conclusion of that process, the panel decided unanimously that the complainant had provided a more credible account of the night in question, which was supported by the testimony of several witnesses, as well as contemporaneous text messages.  The panel further determined that the plaintiff lied when addressing both the fact-finder and the UWC panel.  Having determined that the complainant was credible and that the plaintiff was not, the panel concluded that the plaintiff had engaged in non-consensual unprotected sexual intercourse with the complainant in violation of Yale's Sexual Misconduct Policy.  The panel therefore recommended to Yale College Dean Marvin Chun[3] that the plaintiff be suspended immediately and through the end of the fall term of 2019.  The panel further recommended that the plaintiff receive training on sexual consent before or immediately upon his return to Yale and that the no-contact agreement between the plaintiff and the complainant remain in effect while both parties remain affiliated with Yale.  (Ex. G.)  On March 26, 2019, Dean Chun accepted the panel's findings, conclusions, and recommended penalty.  (Ex. H.)  The plaintiff appealed Dean Chun's decision to Provost Benjamin Polak on March 31, 2019, which appeal was denied on April 16, 2019.  (Ex. I, J.)

## III.   **Legal Standard**

"The Second Circuit applies similar standards for temporary restraining orders and preliminary injunctions and district courts have assumed them to be the same."   J.S.R. v.

---

[3] Under the UWC process, the decision maker is the Dean of Yale College.  Dean Chun plays a very different role from Dean Angela Gleason, who is Dean of the ███████████████████████████████.  Dean Gleason had no role in any of the UWC process other than to communicate some information to the plaintiff about the conclusion.

Sessions, 330 F. Supp. 3d 731, 737 (D. Conn. 2018) (Bolden, J.); Holley v. Cournoyer, 2018 U.S. Dist. LEXIS 3593, *6 (D. Conn. Jan. 9, 2018) (Bolden, J.).

Preliminary injunctive relief "is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'" JBR, Inc. v. Keurig Green Mt., Inc., 618 Fed. App'x 31, 33 (2d Cir. 2015) (quoting Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007)); Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (same).  The Supreme Court has held that a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat'l Res. Defense Council, Inc., 555 U.S. 7, 20 (2008).  The Second Circuit's modified test provides that a movant "must demonstrate: (1)[a] a likelihood of success on the merits or…[b] sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (quoting Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010)).  The plaintiff bears the burden of proof on each element. Blum v. Schlegel, 830 F. Supp. 712, 723 (W.D.N.Y. 1993).

A prohibitory injunction seeks to "maintain the status quo pending a trial on the merits," while a mandatory injunction seeks to "alter the status quo by commanding some positive act." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).  "Status quo" is simply defined as "[t]he situation that currently exists." Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006).  See also,

7

<u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78, 89 (2d Cir. 2006) (mandatory injunction "is said to alter the status quo by commanding some positive act").   "The standard of proof to be applied in determining whether the moving party has satisfied the elements for a preliminary injunction depends on whether the party is seeking a mandatory or prohibitory injunction." <u>Vantico Holdings S.A. v. Apollo Mgmt.</u>, 247 F. Supp. 2d 437, 450 (S.D.N.Y. 2003).   "[I]f a party seeks a mandatory injunction, the party must satisfy a higher standard and the preliminary injunction should be granted only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or serious damage will result from a denial of preliminary relief." <u>Id.</u> at 451.   "A mandatory injunction imposes a significant burden on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." <u>Kartman v. State Farm Mut. Auto. Ins. Co.</u>, 634 F.3d 883, 892 (7th Cir. 2011).

There can be no question that the injunctive relief that the plaintiff seeks here is mandatory.  <u>See</u>, <u>e.g.</u>, <u>Montague v. Yale University</u>, 2017 U.S. Dist. LEXIS 216093 n. 10 (D. Conn. March 8, 2017) (Covello, J.) (concluding that the plaintiff sought a mandatory injunction because he requested the court to order Yale to reinstate him, which was an affirmative act since the plaintiff had already been expelled); <u>Barsoumian v. Williams</u>, 29 F. Supp. 3d 303, 319 (W.D.N.Y. 2014) (plaintiff surgical resident's motion for preliminary injunction seeking "reinstatement as an active surgical resident for the purpose of continued training during the pendency of this action" sought mandatory relief); <u>Holmes v. Poskanzer</u>, 2007 U.S. Dist. LEXIS, *8-9 (N.D.N.Y. Jan. 3, 2007) ("because Plaintiffs seek an injunction that would command SUNY-New Paltz to reinstate them and alter the status quo, they are moving for a mandatory injunction, and must meet a higher showing for the issuance of an injunction in this matter");

Cartagena v. Crew, 1996 U.S. Dist. LEXIS 20178, *17 (E.D.N.Y. Sept. 5, 1996) (reinstatement of suspended school board members would constitute mandatory relief); accord Schrier v. Univ. of Colo., 427 F.3d 1253, 1261 (10th Cir. Colo. 2005) (holding that plaintiff-professor's motion for preliminary injunction seeking reinstatement would require an affirmative act and therefore requested mandatory relief); Preston v. Bd. of Trs. of Chi. State Univ., 120 F. Supp. 3d 801, 804-05 (N.D. Ill. 2015) (reinstatement of expelled university student would constitute mandatory relief); Isler v. N.M. Activities Ass'n, 2010 U.S. Dist. LEXIS 14454, *23 (D.N.M. Feb. 19, 2010) (terminated employee's motion for preliminary injunction seeking reinstatement constitutes "disfavored mandatory injunction" as it would compel affirmative action and ongoing court supervision); Bailey v. Clovis Unified Sch. Dist., 2008 U.S. Dist. LEXIS 10347, *8-9 (E.D. Cal. Feb. 11, 2008) (plaintiff student's motion for preliminary injunction seeking reinstatement on varsity basketball team "reflects the essential characteristics of a mandatory injunction" and is thus subject to a higher degree of scrutiny).  The plaintiff here was suspended from Yale University and now seeks reinstatement as a student in good standing.  Since granting an injunction in the present action would alter the "situation as it currently exists," the plaintiff seeks a mandatory injunction and must meet the higher burden of proof.

**IV.    Legal Argument**

> **A.    Plaintiff's Delay in Seeking Injunctive Relief Mandates Denial of His Motion.**

The plaintiff was informed of Dean Chun's decision to accept the UWC Panel's findings of fact and recommendation of a two semester disciplinary suspension on March 26, 2019.  At that time, there was only one month of classes remaining in the Spring 2019 semester.  This fact was known to the plaintiff and his lawyer.  Instead of immediately seeking injunctive relief at the time his suspension was imposed, the plaintiff waited one month, until the day before classes

ended, to file his motion for a temporary restraining order and a preliminary injunction. The plaintiff was not required to delay filing his action until the Provost denied the plaintiff's appeal of Dean Chun's decision on April 16, 2019. The suspension was effective on March 26, 2019, and the plaintiff could have filed his suit and application for preliminary relief then. Even if the plaintiff had been required to wait until the appeal was decided, there is absolutely no reason for the plaintiff to have delayed from Provost Polack's appeal decision on April 16 until April 25 to file his complaint and application. To make matters worse, he then asked for a hearing on the temporary restraining order to be held more than a week later. These delays refute the plaintiff's claim that he has suffered irreparable harm. If this were truly an emergency, the plaintiff would not have delayed from March 26 to May 3 – five and a half weeks – for a hearing on his motion.

"'Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect Plaintiffs' rights.'" The Media Grp., Inc., 2001 U.S. Dist. LEXIS 1993, at *6 (JCH) (D. Conn. Feb. 14, 2001) (quoting Citibank v. Citytrust, 756 F.2d 273, 276 (1985)). For this reason, it is well settled in the Second Circuit that a delay in seeking injunctive relief "*standing alone*" is sufficient to deny an application for a preliminary injunction. Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (emphasis added); Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, 934 F.2d 30, 35 (2d Cir. 1991) (delay belies claim of irreparable harm); Richard A. Leslie Co., Inc. v. Birdie, LLC, 2007 U.S. Dist. LEXIS 88437, at *5 (S.D.N.Y. Nov. 26, 2007) (delay was sufficient "in and of itself" to warrant denial of preliminary relief.)

In Citibank, the seminal Second Circuit decision on the issue of delay in the context of a request for preliminary injunctive relief, the plaintiffs moved in September 1984 to preliminarily enjoin Citytrust from using the "City" prefix on any office in New York State. Citibank, 756

F.2d at 273-75. The proof adduced for the motion indicated that Citibank had actual notice of Citytrust's planned expansion into Long Island ten weeks prior to seeking an injunction. Id. Reversing the district court's award of a preliminary injunction, the Second Circuit determined that "Citibank's failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (Internal quotations omitted.) Id. at 277. See also, Richard A. Leslie Co., Inc., 2007 U.S. Dist. LEXIS 88437 (S.D.N.Y. Nov. 26, 2007) (delay was sufficient "in and of itself" to deny preliminary relief.)

"[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays..." Life Techs. Corp. v. AB Sciex Pte. Ltd., 2011 U.S. Dist. LEXIS 40586, at *19 (S.D.N.Y. Apr. 11, 2011) (quoting Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419-20 (S.D.N.Y. 1998) (delay "clearly belied" any claim of irreparable injury); see, e.g., Silber v. Barbara's Bakery, Inc., 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (collecting cases and noting that "delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief."); see also Fisher Price, Inc. v. Well-Made Toy Mfg., 25 F.3d 119, 124-25 n.1 (2d Cir. 1994); Livery Round Table, Inc. v. N.Y.C. FHV & Limousine Comm'n, 2018 U.S. Dist. LEXIS 65523, at *9 (S.D.N.Y. Apr. 18, 2018); Landers v. Samuelson, 2012 U.S. Dist. LEXIS 30922, at *6 (E.D.N.Y. Mar. 8, 2012); Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc., 2001 U.S. Dist. LEXIS 14460, at *5-6 (S.D.N.Y. Sept. 19, 2001); Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc., 909 F. Supp. 896, 910 (S.D.N.Y. 1995); Andersen Consulting LLP v. Am. Mgmt. Sys., Inc., 1995 U.S. Dist. LEXIS 12417, at *4 (S.D.N.Y. Aug. 28, 1995); Birnbaum v. Blum, 546 F. Supp. 1363, 1367-68 (S.D.N.Y. 1982).

11

Courts have considered a plaintiff's delay in denying applications for preliminary relief specifically in cases arising out of university disciplinary proceedings and other academic contexts.  The court in <u>Knoch v. Univ. of Pittsburgh</u>, 2016 U.S. Dist. LEXIS 117081 (W.D. Pa. Aug. 31, 2016), denied a student's request for preliminary injunction on facts which are virtually identical to those of the present case.  That case involved discipline imposed on an undergraduate arising out of a domestic dispute with a female university student.  On May 17, 2016, after the conclusion of a lengthy internal administrative process, the plaintiff was suspended for two academic terms.  At the time, the plaintiff had only one semester left to graduate.  In late June 2016, the plaintiff filed suit against the university.  On July 11, 2016, he filed a motion for a preliminary injunction seeking reinstatement.  In denying the motion, the court observed that

> Plaintiff filed his Motion for Preliminary Injunction…thirteen days after he filed his complaint and two months after [the provost] accepted the [university panel's] recommendation…and the adjudication process ended….  Plaintiff provides no excuse for failing to file his motion for preliminary injunction until two months after he was put on final notice of his suspension, and approximately a month and a half before the commencement of the Fall 2016 semester….  Accordingly, Plaintiff has not shown that he will suffer irreparable injury if the injunction does not issue.

<u>Id.</u> at *28-29.  The present plaintiff requested that the hearing be scheduled on his application for preliminary relief on May 3, three business days before all exams and course requirements must be completed.  This Court should not rush to judgment on this matter simply because the plaintiff delayed in making his request.

In <u>Anyadike v. Vernon Coll.</u>, 2016 U.S. Dist. LEXIS 3161 (N.D. Tex. Jan. 11, 2016), the Court denied an application for preliminary relief, observing that the plaintiff's decision to delay filing his request for preliminary injunction "until weeks before he would have otherwise graduated from the [nursing] Program not only limits the Court's ability to analyze Plaintiff's claims, it militates against a finding of irreparable harm."  <u>Id.</u> at *29-30.  The court also found in

the alternative that the plaintiff's claimed irreparable harms – emotional distress and lost earning potential – were legally insufficient to warrant "the extraordinary remedy of a preliminary injunction." Id. at *30-31.

Yet another example is LaFreniere v. Regents of the Univ. of Cal., 2006 U.S. Dist. LEXIS 47252 (N.D. Cal. July 6, 2006), in which the plaintiff filed suit in December 2004 against the defendant university claiming that his expulsion was a result of race discrimination. In April 2005, the trial court granted the defendants' motion to dismiss. The plaintiff appealed the ruling and, in March 2006, the appellate court overturned the trial court's decision and reinstated the action. In June 2006, the plaintiff filed a motion for a preliminary injunction seeking immediate reinstatement. Without conducting a hearing, the court denied the plaintiff's motion, based in part on the lengthy delay between his expulsion and the filing of his application for preliminary injunctive relief. Id. at *11 ("Perhaps most telling in this regard is [the plaintiff's] lengthy delay in seeking injunctive relief. An unreasonable delay in seeking such relief is relevant in deciding whether such relief is truly necessary.")

The present plaintiff has not even attempted to explain why he waited one month to file his motion when he knew that classes ended on April 26, 2019. It cannot reasonably be disputed that all of the materials he needed to prepare his motion – including the UWC fact-finder and panel reports, the publicly available policies and procedures he claims the defendants violated, and of course his own materials and recollection of events – had already been provided to him. He could have, and should have, filed his complaint accompanied by a motion seeking a temporary restraining order permitting him to complete his coursework immediately after the March 26, 2019 suspension. Instead, he waited one month to initiate this action, and then didn't seek a hearing for another eight days. By the time the plaintiff filed his motion seeking

13

injunctive relief, classes had ended and the plaintiff will be unable to successfully complete his coursework to graduate in May 2019.  By failing to act promptly, the plaintiff deprived himself of the opportunity to obtain preliminary relief during the semester in which he was suspended.  Had he acted promptly, it is possible that he would have been able to be reinstated, complete his coursework, fulfill his course requirements, and graduate on time with his class.

Even if the Court were inclined to grant the plaintiff's motion, the delay in filing this motion and seeking a hearing has placed the plaintiff in a position where it is impossible for him to successfully complete his courses and graduate this semester, even if the Court were to grant the Motion for Temporary Restraining Order.  At the time of his suspension on March 26, 2019, the plaintiff was enrolled in five classes: ███████████████████████████████████ ████████████████████████████████████████████████████.  Classes for the Spring 2019 semester ended on April 26, 2019.  The plaintiff missed the entire last month of his classes; the semester is thirteen weeks long and the plaintiff missed the final five weeks.  Those five weeks of class are important to the learning process.  The plaintiff missed 40% of the class sessions in all of his courses.  Final examinations are scheduled to take place between May 2, 2019 and May 8, 2019 and the grades for senior students are due by May 10, 2019.  With this timeline, it is impossible for the plaintiff to make up a month's worth of work and complete his final examinations and projects.

Professor ████████████, who teaches the plaintiff's ██████████████████ class, will testify that the plaintiff has only completed assignments worth 35% of his grade: one presentation, worth 20%, and three problem sets, each worth 5%.  The outstanding assignments at the present time include one problem set, a take home final exam, and an oral exam.  The take home final exam, which is worth 30%, was due on April 26, 2019.  The oral exam, which must

14

be scheduled with Professor ████, is also worth 30%.  The oral exam is required to be completed before the take-home final exam is submitted.  Thus, the plaintiff cannot complete 65% of the course requirements in that course. Professor ████ course is cumulative, such that it goes slowly in the beginning, but each section of the course builds on the past sections.  The final month of the course, all of which the plaintiff missed, contains approximately 50% of the course material.  Even if the plaintiff were able to somehow complete the outstanding assignments between May 3 and May 8, it is inconceivable that he would receive a passing grade in the course when he has missed 50% of the course material.

Similarly, the plaintiff will be incapable of completing his ████████ prior to the due date.  His senior advisor is Professor ██████████.  While the ██████████ is largely self-directed, the student is required to work with an advisor.  Professor ██████ indicated that his practice is to work with the senior student to come up with a workable project, and then meet with the student several times during the semester to "refine it" before it is submitted.  In this case, the plaintiff did provide a written description of his project which involved creating ████████████.  Professor ████ noted that he thought this was a "good beginning."  However, the plaintiff never returned to consult with Professor ████ again.  As a result, Professor ████ provided no further guidance on the project.  In order to complete the requirements of the ██████████, the plaintiff would need to create the ████, demonstrate to Professor ████ that it "actually works," and thereafter prepare a final report on the project.  The due date for the final report is May 3.  As with the ████████████ course, the due date for plaintiff's compliance with the course requirements will have passed by the time of the May 3 hearing on plaintiff's Motion for a Temporary Restraining Order.  As with all senior grades, the grade for the ████████ must be submitted no later than May 10.

The remaining requirements for the plaintiff's ███████████ course include a presentation and a final essay.  The presentation was due on April 24, 2019 and the essay is to be submitted by May 2, 2019 at the latest.  In his ███████████ class, the plaintiff was required to submit a project consisting of reflections on seven different ███ by April 26.  A ten page paper is due by May 6.  The plaintiff needs to complete all five of the courses in which he is enrolled in the present semester, and to pass them, in order to graduate. Given that there are just three business days remaining prior to the end of exams and in light of the fact that the plaintiff has already missed final deadlines for several of his courses and the fact that he has missed 40% of the class sessions, it is clear that he cannot accomplish that in the short time that remains.  Indeed, he has already missed final deadlines in four of his five courses. Accordingly, granting preliminary relief to allow him to re-enroll would be a futile act.  The court should deny the plaintiff's application for preliminary relief on that basis alone.

If the Court orders the plaintiff back to class at this late juncture, it will have to make numerous decisions regarding the reasonableness of Yale's academic requirements, and it will be forced to second-guess the University's educational judgments in a way that courts have routinely declined to do.  See, Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999) ("courts should refrain from second-guessing the disciplinary decisions made by school administrators."); Gupta v. New Britain Gen. Hosp., 239 Conn. 574, 594 (1996) ("[W]e approach with caution, and with deference to academic decision making, the plaintiff's challenge to the motivation of the hospital in terminating his residency."); Rafalko v. University of New Haven, 129 Conn. App. 44, 48 (2011) ("A court must be careful not to substitute its judgment improperly for the academic judgment of the school.")

Granting the plaintiff's Motion for Temporary Restraining Order in the present case will have the effect of permanently altering Yale's decision, without even giving the University an opportunity to present its evidence.  If the plaintiff is allowed to return to school and graduate on May 20, there will never be a trial on the merits. The plaintiff will have achieved his ultimate relief, and there will be no opportunity for the defendants to defend themselves. Therefore, the Court should deny the plaintiff's motion for a temporary restraining order and a preliminary injunction.

### B.      The Plaintiff Cannot Establish Irreparable Harm.

The Second Circuit has repeatedly admonished that "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Rodriguez v. DeBuono, 175 F.3d 227, 234-35 (2d Cir. 1999) (citations and quotation omitted).  Indeed, irreparable harm "is the 'sine qua non for preliminary injunctive relief.'"  JBR, Inc., 618 Fed. App'x at 33 (quoting USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1295 (2d Cir. 1995)).  "As such, the moving party *must first demonstrate that irreparable harm would be 'likely'* in the absence of a preliminary injunction '*before the other requirements for the issuance of [a preliminary] injunction will be considered*.'"  Id. (quoting Rodriguez, 175 F.3d at 234) (emphasis added).  "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied."  Rodriguez, 175 F.3d at 234.  See also, Thompson v. Lantz, 2008 U.S. Dist. LEXIS 21907, *7 (D. Conn. Mar. 20, 2008) (Thompson, J.) (a party seeking injunctive relief must demonstrate irreparable harm before other requirements for the issuance of an injunction will be considered.)

Courts have repeatedly held that a delay in graduation occasioned by a temporary suspension does not constitute irreparable harm.  The parties can try the case, and if the court

believes that the plaintiff should be reinstated after a full hearing on the merits, that can occur, without any risk that the plaintiff will suffer irreparable harm.  See e.g., Knoch v. University of Pittsburgh, 2016 U.S. Dist. LEXIS 117081, *27 (W.D. Pa. Aug. 31, 2016) ("interruption of a student's education, while a genuine injury, is not irreparable").  This is even more true in cases like the present one, which involve a temporary suspension rather than an expulsion.  In those cases, the temporary delay is clearly not irreparable harm.  Thus, it has been noted: "Even if the plaintiff were to experience a delay [in graduation] as a result of his suspension, this would not constitute irreparable harm which could not be compensated with money damages in the future, if warranted."  Howe v. Pennsylvania State University - Harrisburg, 2016 U.S. Dist. LEXIS 11981 *21 (M.D. Pa. Feb. 2, 2016).  To the same effect is Pierre v. Univ. of Dayton, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("a suspension from school is not irreparable").  See also Mostaghim v. Fashion Inst. Of Tech., 2001 U.S. Dist. LEXIS 19789, *7-8 (S.D.N.Y. December 3, 2001) (suspension of student did not constitute irreparable harm); Schulman v. Franklin & Marshall College, 371 Pa. Super. 345 (Pa. Super. Ct. 1988) (delay in an educational program caused by a suspension does not constitute irreparable harm).  The present plaintiff's delay in his graduation simply does not, as a matter of law, constitute irreparable harm.

The rule in this District is that even the permanent expulsion of a student does not constitute irreparable harm as a matter of law.  In Montague v. Yale Univ., 2017 U.S. Dist. LEXIS 216093, *5 (D. Conn. Mar. 8, 2017), Judge Covello concluded that the expulsion of a second semester senior undergraduate student did not constitute irreparable harm.  In that case, the plaintiff, who had been expelled from Yale after a UWC panel concluded that he had sexually assaulted a female student, argued that, without temporary injunctive relief, he would not graduate from college, enter a post-graduate degree program, or secure the same types of

employment opportunities as he would have been able to secure with a Yale degree.  Judge
Covello concluded that, while the plaintiff might suffer harm from the expulsion, he could not
establish the irreparable harm required for the imposition of a mandatory injunction.  Id. at *6.
As is true with most of the college students who predict an inability to graduate from college or
to pursue a professional career if they are not reinstated, Mr. Montague's fears proved to be
unfounded.  He received his bachelor's degree from a different university and is on target to be
awarded his Master's in Accountancy at the end of this summer.  He already has a job lined up
with PricewaterhouseCoopers, one of the world's largest accounting firms.  All of this occurred
despite the fact that Mr. Montague solicited, and received, nationwide publicity from the media
throughout the course of the litigation.

In denying the application for preliminary injunction without holding an evidentiary
hearing, Judge Covello in the Montague case reasoned that if the plaintiff subsequently prevailed
on the merits of his claims and was reinstated to Yale following a trial, "he will have suffered a
delay in his education, analogous to a suspension, which can be remedied through monetary
compensation."  Id. at *7.  Since the plaintiff failed to demonstrate irreparable harm, his motion
for injunctive relief was denied.  The same reasoning applies with equal force in the present case.
The plaintiff's suspension will not produce irreparable harm.  Notably, he is not being deprived
of earning his undergraduate degree from Yale; he is only delayed in receiving it.  There is no
reason for this Court to enter a mandatory injunction prior to allowing the defendants to conduct
discovery and contest the plaintiff's claims in the normal course at a trial, rather than granting
him his ultimate relief now.

Phillips v. Marsh, 687 F.2d 620 (2d Cir. 1982), is also on point.  In that case, the
plaintiff, a cadet at the United States Military Academy at West Point, was expelled from the

Academy in her final semester following repeated violations of the Cadet Disciplinary System. The district court granted her motion for a preliminary injunction seeking reinstatement. On appeal, the Second Circuit reversed the trial court's decision, because the plaintiff had failed to make a showing of irreparable harm: "We can conceive of no irreparable harm that would accrue to her in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages." Id. at 622. See also, Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir. 1979). Nothing distinguishes the harm claimed and rejected by the Second Circuit in Phillips from the harm claimed by the present plaintiff.

Similarly, in Caiola v. Saddlemire, 2013 U.S. Dist. LEXIS 43208 (D. Conn. Mar. 27, 2013) (Bryant, J.), the plaintiff filed a motion for a preliminary injunction seeking reinstatement after being expelled from the University of Connecticut for violations of the Student Code. Judge Bryant denied the motion because the plaintiff failed to establish irreparable harm:

> While an expulsion is a severe penalty, particularly since [the plaintiff] was on the verge of graduation and had been admitted into a masters in education program, he is not entitled to the relief sought because he has failed to establish irreparable harm. In order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries.

Id. at *4. Judge Bryant summarily dismissed as "speculative" the plaintiff's generalized claim that "the stigma from his expulsion will interfere with his academic and teaching career." Id. at *4-5. Similarly, the present plaintiff, like the plaintiff in Montague v. Yale, has forecast that he will be unable to pursue a professional career. Unlike Mr. Montague, who was expelled from Yale, the present plaintiff will achieve his Yale degree following his suspension. Certainly a one year delay in starting a career can be easily remedied by an award of money damages equal to one year's salary. Economic experts commonly testify in both employment cases and personal

injury cases as to the calculation of both past and future lost earnings.  It is hornbook law that when a claimed wrong can be remedied by an award of money damages, there is no irreparable harm and an injunction may not issue.  Similarly, juries can, and often do, award money damages for emotional distress.

Cases finding an absence of irreparable harm in circumstances involving the suspension or expulsion of a student are legion.  See, e.g., Doe v. Syracuse Univ., 2018 U.S. Dist. LEXIS 108056, *7-8 (N.D.N.Y. June 28, 2018) (Plaintiffs did not produce any evidence that would support a finding that if they were to submit a transcript as part of their applications to transfer to another institution, the institution would deny their application because of that notation. Therefore, the court concluded that the plaintiffs failed to show that they would suffer an imminent and actual harm if the Court did not grant the injunction); Doe v. Black Sch., 310 F. Supp. 3d 969, 983-84 (D. Minn. 2018) ("Doe's most certain harm is the financial loss of his scholarship and the emotional harm caused by the loss of a senior semester's worth of memories. Both are compensable through money damages."); Preston v. Bd. of Trs. of Chi. State Univ., 120 F. Supp. 3d 801, 805-06 (N.D. Ill. 2015) ("a student's ambitions in a particular future employment path" do not warrant the entry of a mandatory interlocutory injunction); Silman v. Utica Coll., 2015 U.S. Dist. LEXIS 8829, *5 n.2 (N.D.N.Y. Jan. 27, 2015) (plaintiff cannot show irreparable harm because classes can be taken at other accredited universities); B.P.C. v. Temple Univ., 2014 U.S. Dist. LEXIS 130410, *12-15 (E.D. Pa. Aug. 27, 2014) (plaintiff failed to establish irreparable harm because he did not put forth evidence showing that he was "potentially barred" from employment, but merely impaired from obtaining employment; and plaintiff's loss of education can be remedied since reinstatement is a possible remedy if he prevails at trial); LaFreniere v. Regents of the Univ. of Cal., 2006 U.S. Dist. LEXIS 47252, *11-12 (N.D. Cal.

21

July 6, 2006) (plaintiff's unsupported claim that he will suffer "irreparable psychological injury" if injunction is denied held insufficient to establish irreparable harm); Marsh v. Del. State Univ., 2006 U.S. Dist. LEXIS 1658, *18 (D. Del. Jan. 19, 2006) (delay in education does not constitute irreparable harm where university has policy that would permit plaintiff to reapply three years following expulsion); Law v. William Marsh Rice Univ., 123 S.W.3d 786, 794-95 (Tex. App. Houston 14th Dist. 2003) ("[Plaintiff] will not be able to return to Rice for two semesters and, therefore, will not have the opportunity to pursue any job with his degree qualifications for at least a year…. Such harm, however, can be compensated by monetary damages"); Mostaghim v. Fashion Inst. of Tech., 2001 U.S. Dist. LEXIS 19789, *8-9 (S.D.N.Y. Nov. 30, 2001) (even if plaintiff had been expelled, he would not  suffer irreparable harm, "since the irreparable harm would flow from the permanent deprivation of his degree, which was not the inevitable consequence of either suspension or expulsion"); Ben-Yonatan v. Concordia Coll. Corp., 863 F. Supp. 983, 986 (D. Minn. 1994) (plaintiff's argument that she may never be admitted to medical school because of her one year break in her academic record is purely speculative and not sufficient to show the irreparable harm necessary to justify injunctive relief); Sohmer v. Kinnard, 535 F. Supp. 50, 52 (D. Md. 1982) ("a mere delay in plaintiff's entry into the profession does not constitute irreparable harm").

In the present case, the plaintiff argues that he will experience imminent and irreparable harm in the absence of a restraining order or injunction because he has accepted a lucrative job offer with ███████████████, which is contingent upon his graduating with a ██████ degree.  He further claims that he will not be hired by ████████████████, or any other employer, if his transcript reveals that he was suspended for sexual assault, and will thus lose out on graduate school and employment opportunities.  (Pl. Br., p. 14, 19.) The plaintiff has

22

offered no proof whatsoever of these claims, other than his unsubstantiated allegations.  These claims provide the Court with nothing more than "mere speculation that there is a possibility" that he "may in some unproved way suffer loss or damage" between now and the conclusion of this litigation.  Media Grp., Inc. v. Ontel Prods. Corp., 2001 U.S. Dist. LEXIS 1993, *6 (D. Conn. Feb. 14, 2001).  Specifically, he has not asserted that his job offer from ███████ ████████ has been revoked in the wake of his suspension.  The plaintiff also has not claimed that he has sought and been denied other employment due to his disciplinary suspension or that he has applied for and been denied admission to any graduate schools.  Indeed, given that the plaintiff secured an offer of employment immediately after his intended graduation from Yale, it appears that he was not planning to pursue a graduate degree.  The plaintiff has failed entirely to provide the Court with "concrete evidence" of any injury that is "actual and imminent, not remote or speculative."  Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002).  See also, Caiola v. Saddlemire, 2013 U.S. Dist. LEXIS 43208 *4-5 (D. Conn. Mar. 27, 2013) (Bryant, J.) (finding that the plaintiff failed to establish irreparable harm when he did not offer any evidence that his expulsion did in fact or even was likely to result in a rescission of his admission into a masters program.)

The plaintiff alleges that he has suffered irreparable harm because his medical coverage was withdrawn as a result of his suspension, and he cannot seek treatment with his psychiatrist. (Pl. Br., p. 7-8.)  At the time of his suspension, the plaintiff was given an automatic thirty day extension of his medical care coverage, which expired on April 25, 2019.  On April 28, 2019, ███ ████████████████████████, Angela Gleason, informed him that Yale had decided to make an exception to the general rule that students who are not currently enrolled are not permitted to

continue treatment at Yale Health.[4]  Dean Gleason urged the plaintiff to call his therapist as soon as possible to make future appointments.  (Ex. K.)  With Yale granting this exception, the plaintiff will suffer no interruption in his medical treatment. He last saw his therapist during the week of April 22, and he will see his therapist during the week of April 29 if he so chooses.

The plaintiff further argues that he has been deprived of the opportunity to watch his friends in their final performances.  (Pl. Br., p. 19.)  Given that classes ended on April 26, 2019 and final exams end on May 8, 2019, the granting of the plaintiff's motion will not afford him the opportunity to watch his friends' performances.  Moreover, this type of emotional harm is comparable to the harms suffered in a personal injury case and is clearly remedied with money damages.  See, Doe v. Black Sch., 310 F. Supp. 3d 969, 983-84 (D. Minn. 2018) ("Doe's most certain harm is the financial loss of his scholarship and the emotional harm caused by the loss of a senior semester's worth of memories. Both are compensable through money damages.") Similarly, a monetary award is an adequate remedy for the plaintiff's claim of emotional distress.

Even if the plaintiff had proffered "concrete evidence" to suggest that it is "likely" that he will suffer the harms suggested in his motion, those harms simply do not, as a matter of law, constitute irreparable harm sufficient to warrant the "extraordinary and drastic remedy" of preliminary injunctive relief.  As others have done under similar circumstances, the present

---

[4] Dean Gleason is the residential college dean for ███████████████████████████.  In that capacity, she acts as the University's interface with students.  In the present case, it was her job to communicate to the plaintiff the fact that he had been suspended.  Dean Gleason had no involvement whatsoever in the UWC hearing process or the decision to suspend the plaintiff.  After the complaint was filed, defense counsel emailed plaintiff's counsel of that fact, and requested that the complaint be withdrawn against Dean Gleason.  Plaintiff's counsel responded that he could not do that, because Yale might claim that Dean Gleason was not acting as the agent of Yale when she informed the plaintiff of the decision and when she later informed him that under Yale's rules, he would no longer have access to medical care following the customary 30 day extension.  Defense counsel then stipulated in writing that Dean Gleason was acting in the course and scope of her authority, and that Yale would be legally liable for any action or inaction on Dean Gleason's part.  Nevertheless, plaintiff's counsel announced that he would not withdraw the claim against Dean Gleason, claiming that it would be "malpractice" to do so.  In a similar vein, plaintiff's counsel has notified Ms. Roe that he intends to sue her personally in ████, where her parents live, for defamation.  His apparent reason for doing so is that she has indicated that her parents are very conservative and would not understand her sexual behavior.

plaintiff has filed a complaint seeking money damages, including for any period of unemployment, as well as for reputational and emotional injuries.  See, Khan v. Yale University, NNH-CV18-5044178-S;  Doe v. Yale University; 3:18-cv-00110-JCH;  Montague v. Yale University, 3:16-CV-00885-AVC; Doe v. Yale University, 3:15-CV-01608 (AVC).  At trial, the plaintiff can solicit expert testimony from a forensic economist to show past and future losses, just as plaintiffs do in a wide variety of cases, ranging from employment discrimination to medical malpractice.

Since money damages are an appropriate remedy for a wrongfully imposed suspension from an educational institution, the present plaintiff has an adequate remedy at law and will not suffer irreparable harm.  Therefore, the plaintiff's application for an injunction should be denied. See, O'Connor Music Co. v. Gemini Enterprises, 1999 Conn. Super. LEXIS 2830 *4 (October 19, 1999) ("An injunction ought not issue if monetary damages adequately protect the injured party.")  The plaintiff's motion for a preliminary injunction must be denied, even if he were able to meet his burden of proving that he will likely prevail on the merits.  See, Jayaraj v. Scappini, 66 F. 3d 36, 39 (2d Cir. 1999) ("Where monetary damages may provide adequate compensation, a preliminary injunction should not issue"); A Royal Flush, Inc. v. Arias, 2018 U.S. Dist. LEXIS 161666, *37, n.2 (D. Conn. Sep. 21, 2018) ("To the extent a monetary recovery is available, the availability of any such relief would mean the absence of the irreparable harm necessary for a preliminary injunction.)  See also Boehm v. Univ. of Pa. Sch. Of Veterinary Med., 392 Pa. Super. 502, 524 (Pa. Super. Ct. 1990) (trial court abused discretion by issuing a preliminary injunction because suspended students could be compensated by monetary damages).

**C.** **The Plaintiff Cannot Demonstrate that He Will Likely Prevail on the Merits.**

Even if this Court determines that the plaintiff can make an adequate showing of irreparable harm, the plaintiff still cannot prevail because he cannot demonstrate that he will likely prevail on the merits of his claims.[5]

      i.      Yale's Decision to Suspend the Plaintiff Should Be Given Great Deference.

Both federal and state courts have repeatedly recognized that an educational institution's disciplinary decisions should be given deference by the courts. The United States Supreme Court has itself expressly enjoined that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999). See also, Doe v. Trs. of Boston Coll., 2016 U.S. Dist. LEXIS 137777, *60 (D. Mass. Oct. 4, 2016) ("the courts must recognize and respect the strong interest of a private university in managing its own affairs"), Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 572 (D. Mass. 2016) ("[I]t is not generally the role of the federal courts to tell a private university how to conduct its affairs."); Charest v. President of Harvard Coll., 2016 U.S. Dist. LEXIS 18493, *51 n.9 (D. Mass. Feb. 16, 2016) ("courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities").

In Doe v. Brown University, 210 F. Supp. 3d 310, 331 (D.R.I. 2016), the district court explained: "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions." See also, Ruggiero v. Yale Univ., 2007 U.S. Dist. LEXIS 66290, *2 (D. Conn. Sept. 10, 2007) (same); Burns v. Quinnipiac Univ., 2009 Conn. Super. LEXIS 237, *1 (Super. Ct. Jan. 22, 2009) ("The Connecticut courts have been reluctant to intervene" in decisions of colleges and

---

[5] Since the plaintiff has only addressed the viability of the Title IX and breach of contract claims in his brief, (Pl. Br., p. 21), the defendants will do the same.

universities on student issues.); <u>Stockstill v. Quinnipiac Univ.</u>, 2010 U.S. Dist. LEXIS 49481, *22-23 (D. Conn. May 19, 2010) (an educational institution's decisions "involve the exercise of professional judgment to which courts should defer.").

A corollary to the principle that academic institutions are to be given substantial deference in disciplinary decisions is that the courts require only that an educational institution has "substantially complied" with its rules and regulations.  Thus, it has been held: "Judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations." <u>Jones v. Trs. of Union Coll.</u>, 937 N.Y.S.2d 475, 477 (App. Div. 2012).  <u>See</u> <u>also</u>, <u>Routh v. Univ. of Rochester</u>, 981 F. Supp. 2d 184, 208 (W.D.N.Y. 2013); <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 358 (N.D.N.Y. 2014); <u>Doe v. Colgate Univ.</u>, 2017 U.S. Dist. LEXIS 180267, *59 (N.D.N.Y. Oct. 31, 2017); <u>Rolph v. Hobart & William Smith Colls.</u>, 271 F. Supp. 3d 386, 405 (W.D.N.Y. 2017); and <u>Purcell v. New York Inst. of Technology-College of Osteopathic Med.</u>, 2017 U.S. Dist. LEXIS 124432, *25 (E.D.N.Y. Aug. 4, 2017).

It would be ironic if the courts failed to afford universities broad discretion when deciding disputes relating to claims of sexual misconduct on campus because the State of Connecticut has explicitly delegated responsibility for addressing this issue to institutions of higher learning.  <u>See</u>, Conn. Gen. Stat. § 10a-55m.  Similarly, the federal government mandated that, pursuant to Title IX, colleges and universities that receive federal funding must create a disciplinary process for adjudicating claims of sexual misconduct.  <u>See</u>, "Dear Colleague Letter" and Q&A on Campus Sexual Misconduct, both issued by the Department of Education in September, 2017.  Under federal law, Yale is required to provide procedures "for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct."  Q&A on

Campus Sexual Misconduct, p. 3.  The courts have recognized that deference to an educational institution's decisions to discipline students who violate the institution's policies on sexual misconduct is in the public interest.  See, Knoch v. Univ. of Pittsburgh, 2016 U.S. Dist. LEXIS 117081, *30 (W.D. Pa. Aug. 31, 2016) ("[A]n educational institution's authority to make disciplinary decisions without having to resort to court intervention is a substantial public interest.  Requiring so would substantially weaken the institution's legitimate disciplinary authority among its students and be detrimental to the public interest, as educational institutions encourage their students to conduct themselves as model citizens in adhering to any applicable code of conduct."); Doe v. Ohio State Univ., 2016 U.S. Dist. LEXIS 21064, *36 (S.D. Ohio Feb. 22, 2016), adopted, 2016 U.S. Dist. LEXIS 52942 (S.D. Ohio Apr. 20, 2016) ("[U]niversities have an interest in disciplining students who have committed serious infractions of university rules and in protecting other students from the type of conduct alleged here [nonconsensual sex], and the public has a similar interest."); Pierre v. Univ. of Dayton, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("[T]here is also a public interest in providing an educational environment that is free from harassment.  Colleges and universities are afforded great latitude in administering their rules and regulations as courts recognize that those institutions' primary responsibility is to provide an atmosphere conducive to study and learning for all students.").

  ii.  <u>Dean Chun's Decision was Timely.</u>

 The UWC Procedures indicate that the decision maker should "generally" render a decision within seven days of receiving the panel's report.  (Ex. D, p. 7.)  However, the UWC Procedures also provide:  "For ease of reference, the following time periods <u>generally apply</u> to the review of a formal complaint.  The UWC Chair may extend a time period for good cause such as illness, holidays, the absence of witnesses from campus, the complexity of the

allegations, or competing demands on UWC Members or decision makers.  The parties will be informed by the Secretary or UWC Chair if a time period is extended, and the UWC Chair's decision regarding extensions will be final." (Emphasis added.) (Ex. D, p. 8.)  As acknowledged by the plaintiff, he in fact received notice of the request for an extension of the deadline for Dean Chun's decision.  (Pl. Br., p. 24.)  On March 21, 2019, the UWC Associate Secretary wrote the plaintiff to "inform [him] that Dean Chun has requested an extension to submit his decision in your case to Tuesday March 26, on account of his travel schedule.  I will share with you the decision when it is available."  (Ex. L.)  It is clear from this communication that Dean Chun requested and was granted an extension through March 26, 2019 to render his decision.  The plaintiff's claim that Dean Chun's decision was untimely is entirely without merit.  Moreover, there is no provision in the UWC Procedures divesting the UWC of jurisdiction over a complaint if the "generally" applicable deadlines are not met.

     iii.  <u>The UWC Had Jurisdiction Over Ms. Roe's Complaint.</u>

    The plaintiff argues, without citing any authority, that the UWC did not have jurisdiction over Ms. Roe's complaint because the plaintiff and Ms. Roe never met on the Yale University campus, did not engage in a sexual encounter on campus, and never interacted with each other on campus, either before or after the sexual encounter.  (Pl. Br., p. 13, 25-27.)  These circumstances do not divest the UWC of jurisdiction over Ms. Roe's complaint of sexual misconduct.  The UWC Procedures allow any current or former Yale student to bring a complaint of sexual misconduct to the UWC if two conditions are met: "First, the person accused of sexual misconduct must be a Yale faculty member, trainee, student, or staff member at the time the complaint is filed.  Second, the alleged misconduct must have occurred at a time when all parties involved were Yale faculty members, trainees, students, or staff members."  (Ex. D, p. 1.)  Both

of these conditions are met in this case.  At the time of Ms. Roe's complaint, the plaintiff was a student of Yale University.  The sexual encounter between the plaintiff and Ms. Roe occurred while both the plaintiff and Ms. Roe were students at Yale University.  There is no requirement that the sexual misconduct occur on Yale University's campus in order for the UWC to have jurisdiction.

The plaintiff's contention that the UWC lacked jurisdiction appears to be based upon the erroneous belief that Ms. Roe brought a Title IX claim seeking damages when she filed a formal complaint with the UWC.  The plaintiff supports his argument with language from Davis v. Monroe County Bd. of Educ., 256 U.S. 629, 633 (1999), wherein the Supreme Court addressed whether Title IX provided for a private cause of action against a school board in cases of student-on-student harassment.  (Pl. Br., p. 25.)  Davis did not involve a complaint concerning sexual misconduct that was brought and adjudicated pursuant to a school's policies and procedures for such complaints.  Ms. Roe did not assert a claim for damages under Title IX when she filed a formal complaint under the UWC Procedures alleging that the plaintiff had violated Yale's Sexual Misconduct Policies.  Accordingly, Davis is completely irrelevant to the present case.

The plaintiff further argues that Yale had no jurisdiction to investigate alleged criminal activity and exceeded the scope of the criminal statutes by investigating an allegation of sexual assault, a crime articulated in Conn. Gen. Stat. § 53a-73a.  (Pl. Br., p. 27-28.)  Of course, as plaintiff's counsel undoubtedly knows, the UWC is not a prosecutor and the plaintiff was never charged with a crime.  A different statute, however, is relevant in this case.  Conn. Gen. Stat. § 10a-55(b) specifically requires institutions of higher learning to adopt policies regarding sexual assault.  Yale did just that with its Sexual Misconduct Policies.  (Ex. M.)  Yale's Sexual Misconduct Policies define "sexual assault" as "any kind of nonconsensual sexual contact,

including rape, groping, or any other nonconsensual sexual touching." (Ex. M, p. 2.) The UWC Panel referenced this definition in its report. (Ex. G, p. 1.) Rather than investigate whether the plaintiff committed the crime of sexual assault as defined in Conn. Gen. Stat. § 53a-73a, the UWC Panel properly considered whether he had violated Yale's Sexual Misconduct Policies by committing sexual assault as defined in those policies.

Since the UWC clearly had jurisdiction over Ms. Roe's complaint pursuant to the UWC Procedures and the UWC Panel only investigated whether the plaintiff had violated Yale's Sexual Misconduct Policies, the plaintiff's claim that the UWC was without jurisdiction to consider Ms. Roe's complaint is utterly without merit.

      iv.      <u>Yale Was Not Required to Revise the UWC Procedures Following the September, 2017 Dear Colleague Letter.</u>

Referencing the Department of Education's September 2017 Dear Colleague Letter, the plaintiff claims that "sweeping changes have been made to the investigation and liability of universities since September 2017, but Yale University has failed to update its UWC procedure since 2017." (Pl. Br., p. 29.) The only "sweeping change" referenced by the plaintiff is his claim that "the current guidance addresses only investigations involving sexual harassment" and that there is "no mention whatsoever of the authority of an institution to conduct an investigation for sexual assault." <u>Id.</u> This is patently untrue. Both the September 2017 Dear Colleague Letter and the Q&A on Campus Sexual Misconduct issued by the Department of Education discuss the broader category of "sexual misconduct," not just sexual harassment. In the Q&A on Campus Sexual Misconduct, the Department of Education requires schools to adopt grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct. As authority for this statement, the Department of Education cites 34 C.F.R. § 668.46(k)(2)(i) as "providing that a proceeding which arises from an allegation of dating

violence, domestic violence, <u>sexual assault</u>, or stalking must '[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result.'"   (Emphasis supplied).   In describing the procedures to be followed by a school in adjudicating a finding of responsibility for sexual misconduct, the Department of Education has stated:  "When resolving allegations of dating violence, domestic violence, <u>sexual assault</u>, or stalking, a postsecondary institution must '[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice.'"   (Emphasis added.)   Q&A, p. 5, quoting 34 C.F.R. § 668.46(k)(2)(iii).   It is clear that the Department of Education continues to require schools to address all forms of sexual misconduct, not solely sexual harassment.   It is equally clear that Yale's procedures comply with the Department of Education guidelines.

It is also noteworthy that Yale's Sexual Misconduct Policies are entirely consistent with the requirements of Conn. Gen. Stat.§ 10a-55m.  That statute, which became effective July 1, 2016, sets forth the requirements for addressing complaints for sexual misconduct at colleges and universities within the State of Connecticut.   The statute specifically requires that secondary education institutions adopt policies providing that "affirmative consent" is the standard to be used in determining whether consent to engage in a sexual activity has been given.   Connecticut law <u>requires</u> that Yale University utilize the preponderance of the evidence standard in its UWC proceedings.   <u>See</u> Conn. Gen. Stat. § 10a-55m (b)(6)(B).   It further stipulates that it is not a valid excuse to a lack of affirmative consent that the respondent "was intoxicated or reckless or failed to take reasonable steps to ascertain whether the student or employee disclosing the alleged violation affirmatively consented."   Conn. Gen. Stat. §10a-55.   This is consistent with Yale's Sexual Misconduct Procedures.

32

In the event that the Court decides to convene an evidentiary hearing, the defendants will call as an expert witness a former employee of the Office of Civil Rights, the section of the Department of Education responsible for administering Title IX.  He will testify, having reviewed Yale's procedures and the documents related to this UWC case, that Yale's procedures do in fact comply with the dictates of Title IX. Since the defendants' Sexual Misconduct Procedures are consistent with both federal and state law, the plaintiff cannot prevail on his claim that the defendant's policies themselves violate the law.

        v.       <u>The UWC Panel Properly Concluded that Ms. Roe Had Not Consented to Unprotected Sexual Intercourse.</u>

The plaintiff first argues that, because Ms. Roe consented to sexual intercourse with the use of a condom, and never revoked that consent, sexual intercourse without a condom was consensual. (Pl. Br., p. 32.)  This argument directly conflicts with the definition of consent set forth in Yale's Sexual Misconduct Policies:

> Under Yale's policies, sexual activity requires affirmative consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter.  Consent cannot be inferred from the absence of a "no;" a clear "yes," verbal or otherwise, is necessary.  Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

(Ex. M, p. 3.)  There is no dispute that Ms. Roe consented to <u>protected</u> sexual intercourse.  Her formal complaint to the UWC was only directed at that part of the sexual encounter wherein the plaintiff penetrated her without using a condom.  (Ex. B.)  The plaintiff agrees that it was a "foregone conclusion" that a condom would be used and that "[c]ondom use was so expected initially, that it went without discussion."  (Pl. Br., p. 8-9.)  Given the clear agreement that a condom would be used, the unprotected sexual intercourse was a new and different sexual

activity for which the plaintiff was required to obtain consent from Ms. Roe.  Under the Sexual Misconduct Policies, the consent given for protected sexual intercourse did not also apply to unprotected sexual intercourse; rather, the plaintiff was required to obtain "positive, unambiguous, and voluntary agreement" from Ms. Roe to engage in unprotected sexual intercourse.  The plaintiff himself has acknowledged that fact. Since condom use was a "foregone conclusion," it is not surprising that Ms. Roe did not anticipate that the plaintiff would engage in unprotected sexual intercourse, and therefore explicitly state her objection to such activity before it occurred.  However, the absence of a "no" did not provide the consent required for unprotected intercourse under Yale's Sexual Misconduct.  (Ex. M.)  It is important to note that the plaintiff does <u>not</u> contend that he did not need separate consent for the unprotected intercourse.  Instead, it is his claim that Ms. Roe twice verbally consented to the unprotected intercourse.  Thus, the question of whether there was consent in this case comes down to whether the panel found the complainant or the respondent more believable.

The plaintiff's claim that he understood there was consent because Ms. Roe "did not react badly" does not establish consent.  A system which endorsed a finding of consent because, after the fact, the other party "did not react badly" would stand the notion of clear, unambiguous and voluntary agreement in advance of each part of any sexual interaction on its head.  Adopting that system would permit an individual to perform whatever sexual act he or she wanted without advance consent; and then be exonerated as long as the victim did not "react badly" immediately after the violation.  If an evidentiary hearing is required, the defendants will call as an expert witness a psychologist who has extensive experience, both academically, and from a treatment perspective, with victims of sexual assault.  She has impressive credentials, having conducted hundreds of assessments of rape and sexual assault victims, including campus sexual assault.

34

She will describe the academic research which has established that the vast majority of sexual assaults are perpetrated by someone who is known to the victim, just as in this case where the parties spent several days communicating with one another on social media before meeting. This familiarity with the aggressor produces a great deal of "confusion, guilt, shame, embarrassment and sadness" in the victims. As a result, the vast majority of victims do not report the assault to authorities, but they will disclose their experience to friends who are close to them in the immediate aftermath of the assault, just as Ms. Roe did in this case. The defendant's expert witness will testify that lay people are often confused "by what are sometimes a rape victim's seemingly paradoxical response to her rape." Thus, it is well known that the women who have been the victim of sexual assault often continue to maintain a relationship with the perpetrator and they delay disclosure to authorities. Indeed, it is known that a victim will "often maintain a relationship with a perpetrator even in the immediate aftermath of the rape."

The defendants' expert witness will testify that Ms. Roe's behavior in this case following the unprotected and unconsented intercourse was exactly the type engaged in by sexual assault victims. She has noted:

> My consistent clinical observation has shown me that victims are *very* concerned about the rape, but feel immediately powerless and in shock to address it. Further, women also go through a period of contemplation in the immediate aftermath of the rape and sexual assault taking time to understand and fully appreciate what just happened to them. They are often riddled with doubt, blame, disappointment, and confusion and may not immediately label the behavior as rape. It often takes time for the victim to assimilate cognitive and emotional information before she can accurately appraise the incident as a sexual violation.

If the Court decides to conduct an evidentiary hearing, it is anticipated that Ms. Roe will testify about the confusion, embarrassment and other emotions which caused her to remain with the plaintiff even after the non-consensual unprotected intercourse.

35

It should be noted that this is not a case where the respondent has ever suggested that he was unaware of the rules regarding obtaining affirmative and unambiguous consent to each stage of sexual interaction.  Indeed, in his written statement to the UWC panel, Mr. Doe observed that he took sexual misconduct seriously, and he noted that he had taken the Title IX training.  (Ex. F, p. 2.)  In this regard, training is given to every freshman student at the start of their first semester; and another training course is provided to every sophomore student.  Mr. Doe noted in his opening statement to the UWC Panel that he had "gone to every CCE meeting, and worked towards possibly becoming a CCE and froco.  Because of these efforts, I believed I was sensitive to sexual issues."[6]  Id.

The plaintiff next claims that he verbally asked for and received consent to engage in sexual intercourse without the use of a condom.[7]  He points to Ms. Roe's message stating that she would have told the plaintiff "ahead of time" if she was not on birth control as "proof" that the plaintiff received consent to proceed with unprotected sexual intercourse.  He claims that Ms. Roe would only have had the opportunity to raise the issue of birth control if the plaintiff had asked for consent to proceed with unprotected sexual intercourse just prior to the plaintiff's decision to penetrate her without a condom.  (Pl. Br., p. 11, 33.)  In other words, he claims that the issue of birth control could only have come up if he had asked for consent to have unprotected sexual intercourse immediately prior to engaging in that sexual act.  This was not the only opportunity for Ms. Roe to have spoken with the plaintiff about birth control, nor was it the

---

[6] "CCE" refers to a "Campus Consent Educator."  These individuals receive extra training on Yale's Sexual Misconduct Policies and serve as a resource to fellow students.  A "froco" is a first-year counselor, who also must have significant familiarity with Yale's Sexual Misconduct Policies.

[7] Of course, if the consent given by Ms. Roe for protected sex also encompassed unprotected intercourse, then the plaintiff would not have been required to verbally obtain consent.  It is evident that at the time of the UWC hearing, the plaintiff was aware that he had to have specific consent for unprotected intercourse.  Otherwise, there would have been no need for him to fabricate his claim that he obtained verbal consent.

most likely time that subject would be raised.  Rather, the most likely time would have been a discussion at the beginning of the encounter, prior to initiating any sexual behavior.  This would have been logical since they met with the intention of having sexual intercourse.  Thus, Ms. Roe's indication that she would have told the plaintiff "ahead of time" if she was not on birth control does not in any way support the plaintiff's claim that he asked for and received consent for unprotected sexual intercourse.[8]

Ms. Roe denies that she consented to unprotected sexual intercourse.  She made that clear to the plaintiff in her messages to him on January 16, 2019.  She stated that she was not comfortable with "being penetrated without protection" and that it left her feeling "confused." (Ex. C, p. 3, 56.)  The following day, Ms. Roe stated that she was having trouble dealing with the fact that they had unprotected sexual intercourse.  She stated: "any way you slice it it wasn't my choice to do that and I didn't consent to it…."  (Ex. C, p. 78.)  The plaintiff never indicated in response that he believed that Ms. Roe consented to unprotected sexual intercourse, verbally or otherwise.  Instead, he stated that unprotected sexual intercourse was "strictly not okay" with him.  (Ex. C, p. 4, 57.)  He did not know if he was drunk or if something else caused him to engage in that behavior with Ms. Roe.  Id.  The plaintiff apologized, stating that it was not a normal thing for him and that he was thankful that it was a brief episode.  (Ex. C, p. 59-60.)  He expressed that it was a mistake "that should not have happened."  (Ex. C, p. 76.)

The UWC Panel was necessarily tasked with assessing the credibility of both the plaintiff and Ms. Roe in determining whether or not the plaintiff had Ms. Roe's consent to engage in unprotected sexual intercourse.  The UWC Panel set forth in great detail the reasons that it considered Ms. Roe's description of the encounter more credible than that of the plaintiff.  (Ex.

---

[8] In the event that the Court deems a hearing appropriate, Ms. Roe will appear and testify, and the Court can make a judgment on the critical issue in this case of whether or not the plaintiff can meet his burden of proving a likelihood of success in demonstrating that his version of these events is more likely to prevail than Ms. Roe's.

G, p. 5-8.)  In particular, Ms. Roe's credibility was supported by text conversations that she had

with two friends on the day of the encounter.  She explained that she spoke with the plaintiff

regarding their STI status at the outset of the encounter, but did not discuss whether or not she

was on birth control at that time.  She explained that they had protected sexual intercourse and

described how the condom bunched up while she was manually stimulating the plaintiff's penis

with her hand.  She told each of her close friends that the plaintiff had unprotected sexual

intercourse with her without her consent.  She indicated that she was uncomfortable with having

unprotected sexual intercourse and explained that she had not anticipated that the plaintiff would

do so.  She expressed that she did not verbally state that she wanted to have unprotected sexual

intercourse with the plaintiff and did not understand why he had engaged in that sexual act.[9]

(Ex. C, p. 11-14, 86-96, 100-109.)

In addition, the UWC Panel noted inconsistencies in the plaintiff's statements to the fact

finder and testimony at the hearing.  He told the fact finder that he had not attempted to call Ms.

Roe to discuss the sexual encounter, despite offering to do so multiple times.  He then told the

UWC Panel that he had tried to call Ms. Roe, but was unable to get through.  Ms. Roe's phone

had no record of a call attempt and the plaintiff claimed to have deleted his call logs when he

reset his phone a few days after the sexual encounter and again in February.  (Ex. G, p. 6.)

While the plaintiff told both the fact finder and the UWC Panel that he was sober and had been

careful to control his drinking, the plaintiff suggested to Ms. Roe that he may have engaged in

unprotected intercourse because he was drunk and not thinking as clearly as he would when

---

[9] The plaintiff argues that Ms. Roe's credibility is damaged because she questioned whether she had been "stealthed" in text messages with her friends.  Whether or not the plaintiff technically engaged in "stealthing" is irrelevant.  The complaint brought to the UWC Panel alleged that the plaintiff had engaged in unprotected sexual intercourse without Ms. Roe's consent.  Notably, the UWC Panel expressly declined to reach a conclusion as to whether the plaintiff intentionally "stealthed" Ms. Roe.  (Ex. G, p. 8.)  That issue was not relevant to whether the plaintiff had violated Yale's Sexual Misconduct Policies.

sober.  Id.  The UWC Panel also noted that, despite claiming he had sought and received consent for unprotected sexual intercourse, the plaintiff never addressed Ms. Roe's assertion in her text that she had not consented.   Strikingly, he addressed all of her other concerns, but never countered her claim that she had not consented to unprotected sexual intercourse.  Id.  Despite the fact that he claimed to be very concerned about contracting diseases, and therefore rarely engaged in oral sex, the plaintiff claimed that he never discussed Ms. Roe's STI status with her. Understandably, the UWC Panel found these two statements inconsistent.  Id., p. 7.

In addition to finding Ms. Roe more credible, the UWC Panel concluded that the plaintiff had misrepresented his actions.  Id., p. 7-8.  The UWC Procedures state:  "Failure to provide truthful information or any attempt to impede the UWC process may result in a recommendation for a more severe penalty or a referral for discipline."  (Ex. D, p. 3.)  The UWC Panel noted that their recommendation for a two semester suspension took into account their conclusion that the plaintiff had misrepresented his actions.  (Ex. G, p. 8.)  The University enacted the UWC Procedures and the Sexual Misconduct Policies not only to remedy instances of sexual misconduct, but also to educate individuals regarding consensual sexual interactions so as to aid in preventing future incidents of sexual misconduct.  Where a respondent lies and misrepresents his actions, and then refuses to accept responsibility, a harsher penalty is necessary to ensure that the respondent learns from the experience and avoids violating the Sexual Misconduct Policies in the future.  Since the UWC Panel concluded that the plaintiff had misrepresented his interactions with Ms. Roe, a more severe sanction was permissible under the UWC Procedures.

vi.        The Plaintiff Fails to Assert Facts Supporting his Title IX Claim.

In order to prevail on his Title IX claim, the plaintiff must prove not only that there was an erroneous outcome in the UWC complaint brought against him, but that the erroneous

outcome was due to gender discrimination.  See, Doe v. Columbia University, 831 F.3d 46, 53 (2d Cir. 2016).  The plaintiff devotes very little argument to this claim, asserting only that his complaint sufficiently states a Title IX claim pursuant to Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016).  Although the plaintiff makes conclusory allegations that Yale failed to conduct an adequate, reliable, and impartial investigation, he does not provide any specific details supporting those allegations.[10]  (Pl. Br., p. 47-48.)

The evidence demonstrates that the investigation was thorough and impartial.  The plaintiff was notified of Ms. Roe's complaint via letter and provided with copies of the complaint, the UWC Procedures, the Sexual Misconduct Policies, and the Statement on Confidentiality of UWC Proceedings.  He was informed that he could submit a response to Ms. Roe's complaint and was encouraged to select an advisor to help him through the UWC process.  The fact finder reviewed Ms. Roe's complaint and the plaintiff's response thereto.  He then interviewed the plaintiff and Ms. Roe, in the presence of their advisors, once in person and once via telephone.  The fact finder also interviewed the three witnesses identified by Ms. Roe and the single witness identified by the plaintiff.  He collected and reviewed communications between Ms. Roe and the plaintiff, as well as between Ms. Roe and the three witnesses she identified.  (Ex. C, p. 1-2.)  Following the completion of his investigation, the fact finder submitted a 20 page report, attaching 97 pages of exhibits.  (Ex. C.)  The case was then submitted to the UWC Panel.  Again, both Ms. Roe and the plaintiff were accompanied by their advisors.  (Ex. G.)  The UWC Panel submitted an eight page report.  Id.  The plaintiff was permitted to submit a response

---

[10] He broadly asserts: "Among other things, the investigator report managed to support complainant's story despite having exculpatory evidence in the first page that proves John had consent to engage in unprotected intercourse." (Pl. Br., p. 49.)  The defendants assume that this refers to Ms. Roe's message regarding birth control.  As has already been explained above, Ms. Roe's text does not establish that the plaintiff requested and received consent for unprotected sexual intercourse. It also is worth noting that the investigator did not, and does not, reach any conclusions in his report. Under Yale's procedures, the investigator assembles evidence and creates a report.  He or she does not make any findings or recommended findings.

to the UWC Panel Report prior to Dean Chun issuing a decision.  The plaintiff was then permitted to file an appeal of Dean Chun's decision.  The plaintiff has not alleged that the defendants breached any of the UWC Procedures; nor does he claim that Ms. Roe received any benefits beyond those that he received.[11]  In fact, although not required, Yale suggested to the plaintiff that he seek counseling at the Yale Health Plan because the UWC Process could be emotionally taxing.  The plaintiff availed himself of that counseling, and Yale has permitted the plaintiff to continue seeing his therapist without interruption, despite the fact that he has been suspended.

Significantly, there is no suggestion that Yale's failure to conduct an adequate, reliable, and impartial investigation was due to the plaintiff's gender.  The plaintiff clearly disagrees with the outcome of UWC hearing.  However, he provides no factual basis for his claim that any of the individuals involved in the UWC process discriminated against him due to his gender.  This is fatal to his claim under Title IX.

Just as a trial court must grant discretion to a jury's findings of fact, this Court should grant considerable deference to the UWC Panel's findings.  The UWC Panel's function was similar to that of a jury.  It reviewed conflicting evidence, heard the testimony of both Ms. Roe and the plaintiff, and reached a conclusion as to which party was most likely accurate and truthful.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  MacCluskey v. University of Connecticut Health Center, 2017 U.S. Dist. LEXIS 23520 *14 (D. Conn. February 21, 2017), *aff'd*, 707 Fed. Appx. 44 (2017).  In the context of a UWC proceeding, the UWC

---

[11] In Paragraph (f) on pages 44 and 45 of brief, the plaintiff addresses a breach of the duty of good faith to provide a fair hearing.  However, that section is obviously copied and pasted, in its entirety, from the complaint filed in Doe v. Yale University, 3:18-cv-00110.  See, Doe v. Yale University, 3:18-cv-00110, Doc. Entry No. 1, ¶ 232.  The allegations clearly do not apply here, as there is a single complainant in this case and there is no allegation of inappropriate groping.

41

Panel performs these functions.  Addressing a jury's consideration of witness credibility, Judge

Richardson has instructed:

> How do you determine truthfulness?  You watched the witness testify.
> Everything a witness said or did on the witness stand counts in your
> determination.  How did the witness impress you?  Did he or she appear to
> be frank, forthright and candid, or evasive and edgy as if hiding
> something?  How did the witness appear; what was his or her demeanor --
> that is, his or her behavior, bearing, manner and appearance while
> testifying? Often it is not what a person says but how he or she says it that
> moves us.

Wilson v. Yale University, 3:15-cv-207.  Unlike the UWC Panel, this Court does not have the

benefit of observing the plaintiff and Ms. Roe as they testified at the hearing.  Thus, the Court is

at a disadvantage in assessing the parties' credibility.  Since credibility is at the heart of the

determination of whether the plaintiff had consent for unprotected sexual intercourse, the Court

should defer to the UWC Panel's findings in that regard, especially because the UWC Panel had

the opportunity to observe the parties' demeanor during their testimony.

### D. The Plaintiff is Not Entitled to Preliminary Injunctive Relief Because the Balance of Equities Does Not Tip Decidedly in Favor of The Plaintiff.

Even if the plaintiff were to establish irreparable harm and that he will likely prevail on

the merits, the plaintiff still cannot prevail because he cannot demonstrate that the balance of

equities tips decidedly in his favor.  Courts considering the balance of hardships between a

student who has been expelled or suspended and an educational institution have routinely found

in favor of the educational institution.  The harm to the plaintiff should his motion be denied –

which is anything but irreparable – is clearly outweighed by the harm that would be suffered by

the defendants, should the plaintiff's motion be granted.

Stockstill v. Quinnipiac Univ., 2010 U.S. Dist. LEXIS 49481 (VLB) (D. Conn. May 19,

2010) is instructive.  The plaintiff argued there that the loss of one semester of classes would

impede his future educational and career opportunities.  Id. at *34.  Judge Bryant found these arguments to be speculative.  Id. at *35.  The hardship for Quinnipiac, on the other hand, was determined to be substantial:

> Quinnipiac has a responsibility to all of its students and to the community at large, not just to the plaintiff. There are thousands of students attending Quinnipiac. Permitting a student to matriculate when he may pose a danger to other students is a greater harm than the harm caused to the plaintiff by rescinding his admission and causing him to miss one semester of classes.

Id. at *35.  Judge Bryant concluded that the plaintiff had failed to establish that the balance of hardships tipped decidedly in his favor.  Id. at 37.

Similarly, in Doe v. Ohio State Univ., 136 F. Supp. 3d 854 (S.D. Ohio 2016), adopted by, 2016 U.S. Dist. LEXIS 52942 (S.D. Ohio April 20, 2016), a case arising from Ohio State's investigation of a claim for sexual harassment, the court held that the issuance of a preliminary injunction would harm others as well as Ohio State:

> Granting Doe's motion is likely to cause harm to others . . . . Granting such a motion would cast doubt on OSU's power to regulate its student body, including investigating and disciplining its students for sexual misconduct.  And since guidance by the Office of Civil Rights on Title IX requires OSU to investigate allegations of off-campus sexual misconduct, not doing so could jeopardize its federal funding . . . .  The Court finds that issuing the injunction could cause harm to others, which weighs in favor of denying the injunction.

Id. at *871.

In Howe v. Pa. State Univ., 2016 U.S. Dist. LEXIS 11981 (M.D. Pa. Feb. 2, 2016), the court reasoned:

> [T]he court considers that Penn State not only has an obligation to the plaintiff, but also to the many other students of the Penn State community…. The court considers that Penn State has a significant interest in disciplining students who engage in misconduct and protecting the other students within its community.  The Third Circuit and the

43

> Supreme Court have both long recognized the need for maintaining order and discipline in our schools without prohibitive costs and in a manner that will contribute to, rather than disrupt, the educational process…. Were the court to grant injunctive relief in this case, that would put Penn State in a position of being second-guessed by the court every time it imposes a sanction upon a student for this type of behavior.  This is in the interest of neither Penn State nor the community.

Id. at *22-23 (citation and internal quotation marks omitted).  See also, LaFreniere v. Regents of the Univ. of Cal., 2006 U.S. Dist. LEXIS 47252, at *13 (N.D. Cal. July 6, 2006) (university's interest in protecting individuals from plaintiff's harmful actions outweighs plaintiff's request for urgent relief); Bonnell v. Lorenzo, 241 F.3d 800, 822 (6th Cir. 2001) ("A college's or university's interest in maintaining a hostile-free learning environment, particularly as it relates to its Title IX funding, is well recognized"); Coleman v. Newburgh Enlarged City Sch. Dist., 319 F. Supp. 2d 446, 456-57 (S.D.N.Y. 2004) (recognizing that the defendants have an interest in protecting the safety of the students and staff and "it is not the province of this Court to instruct the Defendants on how to accomplish that goal").

The balance of the hardships similarly tips in favor of the defendants in the present case. Yale would suffer great hardship if the plaintiff's motion was granted, which would force the University to readmit a student who had been found responsible for non-consensual unprotected sexual intercourse with another student.  As Judge Bryant held with respect to Quinnipiac: "[Yale] has a responsibility to all of its students and to the community at large, not just to the plaintiff."  Stockstill, 2010 U.S. Dist. LEXIS 49481 at *35-36. Permitting the plaintiff to re-enroll for the Spring 2019 semester is a far greater harm to the Yale community than any speculative harm the plaintiff may suffer.  Id.  Furthermore, the granting of the plaintiff's motion would "substantially damage [Yale's] reputation and generate concern among the students who attend as well as their families."  Id.  The judicial undoing of his suspension would very likely

have the effect of chilling other victims of sexual assault from coming forward, since it would convey to the Yale community that filing a complaint under Yale's Sexual Misconduct Policies has no real consequence except to expose sexual assault victims to the risk of public scrutiny.

Ordering Yale to readmit the plaintiff at the present time would also eviscerate Yale's legitimate interest in enforcing its own policies.  See, e.g., Ruggiero v. Yale Univ., 2007 U.S. Dist. LEXIS 66290, *7 (WWE) (D. Conn. Sep. 10, 2007) ("an educational institution's academic decisions involve the exercise of professional judgment to which courts should defer"); Schaer v. Brandeis Univ., 432 Mass. 474, 482 (2000) ("A college must have broad discretion in determining appropriate sanctions for violations of its policies."). That statement applies with equal force to the case at bar. Indeed, granting preliminary relief at the present time would have the effect of deciding this case on the merits, something courts are loathe to do prior to the time the parties have had a chance to engage in discovery and have a complete trial.  It is clear that a trial on the merits cannot be held prior to Yale's graduation, which is scheduled for May 20, 2019.  Therefore, granting the plaintiff's present motion will deprive Yale of ever getting a hearing on the merits.  In this regard, it has been held that "ordering [plaintiff's] return to classes would effectively prevent [the University] from ever suspending [the plaintiff] because, if allowed to return to his classes, he would likely complete his coursework before this case is tried." Bhandari vs. Columbia, 2000 U.S. Dist. LEXIS 3720, at *23 (S.D.N.Y. March 27, 2001.)

Since the balance hardships do not tip in the plaintiff's favor, this Court should deny the motion for preliminary injunction irrespective of what the Court might conclude on any of the other factors governing the issuance of a preliminary injunction.

**E.**     **The Issuance of a Preliminary Injunction is not in the Public Interest.**

In denying the request for reinstatement of a student to Quinnipiac University, Judge Bryant noted that the hardship imposed on the defendant was substantial, and the issuance of the injunction was contrary to the public interest:

> Quinnipiac has a responsibility to all of its students and to the community at large, not just to the Plaintiff.  There are thousands of students attending Quinnipiac.  Permitting a student to matriculate when he may pose a danger to other students is a greater harm than the harm caused to the Plaintiff by rescinding his admission and causing him to miss one semester of classes.

Stockstill v. Quinnipiac University, 2010 U.S.Dist. LEXIS 49481, at *22-23 (VLB) (D. Conn. May 19, 2010.)  Allowing the plaintiff to return to campus over the defendants' objection would also compromise Yale's legitimate interest in enforcing its own policies.  See Ruggiero, 2007 U.S. Dist. LEXIS 66290, at *2 (WWE) (D. Conn. September 10, 2007.); Bhandari vs. Columbia, 2000 U.S. Dist. LEXIS 3720, at *23 (S.D.N.Y. March 27, 2001.) "(Ordering [plaintiff's] return to classes would effectively prevent [the University] from ever suspending [the plaintiff] because, if allowed to return to his classes, he would likely complete his coursework before this case is tried.") Furthermore, as Judge Bryant noted in the Stockstill case, returning to campus could subject the defendant to "potential liability and reputational liability and damage, all to the detriment of the University, including its students, faculty and alumni." Id. at *35-36.

Judges in other jurisdictions have similarly acknowledged "there is also a public interest in providing an educational environment that is free from harassment.  Colleges and universities are afforded great latitude in administering their rules and regulations, as courts recognize that those institutions' primary responsibility is to provide an atmosphere that is conducive to study and learning for all students." Pierre v. University of Dayton, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015).  Similarly, it has been noted that "universities have an interest in disciplining students

46

  
who have committed serious infractions of University rules and in protecting other students from the type of conduct alleged here, and the public has a similar interest." <u>Doe v. Ohio State University</u>, 2016 U.S. Dist. LEXIS 21064, *36 (S.D. Ohio 2016).

Yale is required by state and federal law to address complaints of sexual misconduct. The public has an interest in Yale abiding by the law, and in addressing and preventing sexual misconduct in the Yale community.  It is also in the public interest for Yale to ensure that the members of its community abide by its Sexual Misconduct Policies.  If the Court requires Yale to reinstate the plaintiff and permits him to complete his courses and graduate, the Court will strip Yale of the authority to enforce its Sexual Misconduct Policies.  Courts have properly declined to interfere with university disciplinary decisions that promote that public interest. "[A]n educational institution's authority to make disciplinary decisions without having to resort to court intervention is a substantial public interest.  Requiring so would substantially weaken the institution's legitimate disciplinary authority among its students and be detrimental to the public interest, as educational institutions encourage their students to conduct themselves as model citizens in adhering to any applicable code of conduct." <u>Knoch v. Univ. of Pittsburgh</u>, 2016 U.S. Dist. LEXIS 117081, at *30 (W.D. Pa. Aug. 31, 2016).  If the plaintiff is granted an injunction, he will complete his classes and graduate.  Even if a jury later enters a verdict in favor of Yale, Yale will no longer have the ability to enforce any discipline against the plaintiff.  Such an outcome is contrary to the public interest.

V.   <u>CONCLUSION</u>

The present plaintiff has not established any of the prerequisites for the issuance of a preliminary injunction.  He does have an adequate remedy at law; he has not suffered and will not suffer irreparable harm without the issuance of an injunction; he is not likely to prevail on the

merits; and the balance of equities tips in favor of the defendants.  Under these circumstances, the Court must deny the plaintiff's request for the issuance of a preliminary injunction.

**THE DEFENDANTS,**
**YALE UNIVERSITY, MARVIN CHUN,**
**JOHN MAYES, JORDAN PILANT,**
**MARIA PINANGO, MARK SOLOMON,**
**JORDON WHITE AND ANGELA**
**GLEASON**

BY: /s/ Patrick M. Noonan  (#ct00189)
Patrick M. Noonan
Colleen Noonan Davis (#ct27773)
Donahue, Durham & Noonan, P.C.
741 Boston Post Road
Guilford, CT 06437
(203) 458-9168

**<ins>CERTIFICATION</ins>**

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/
Patrick M. Noonan