UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:19-cv-00620-AWT |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
| Defendants | : | MAY 3, 2019 |

**DEFENDANTS' REPLY TO THE DECLARATION OF JOHN DOE
DATED MAY 1, 2019**

Most of the information contained in plaintiff's Declaration has already been addressed in defendants' briefs, and those arguments will not be repeated here. Defendants make the following response to those issues which were not previously addressed.

In Paragraph 5 the plaintiff claims under oath that he has been found guilty of a criminal act in the State of Connecticut, i.e. "sexual assault." That is not true, which the plaintiff and his counsel both know. The plaintiff has been found responsible for violating Yale's Sexual Misconduct Policies by engaging in nonconsensual unprotected intercourse. There were no criminal proceedings. Also in Paragraph Five of the Declaration, the plaintiff claims that Yale "never defined consent to sexual intercourse to include subsets of protected sex or unprotected sex." The plaintiff himself, both in writing and orally at the Panel hearing, admitted that he understood that unprotected intercourse was a separate and distinct act from protected intercourse; indeed, that is the reason that he claims that he asked for and obtained consent to the unprotected intercourse in this case. As already explained in the defendants'

prior briefs, Yale's Sexual Misconduct Policies specifically provide that there must be unambiguous voluntary consent at each stage of a sexual interaction. In this case, both Mr. Doe and Ms. Roe agreed during the UWC process that having unprotected intercourse is "a separate stage of the interaction" from protected intercourse and therefore required consent.

Mr. Doe is particularly cognizant of Yale's definitions of consent, given the fact that he attended not only the training on sexual consent given to all freshman and all sophomores, but also took the extra training required to be a Community Consent Educator and a First Year Counselor. In his opening statement to the panel, Mr. Doe wrote: "I am terribly sorry for the way that Ms. [Roe] had felt. I thought we had a mutual understanding of what occurred between us. I was wrong and bear the responsibility of [sic] that." In other words, Mr. Doe admitted that there was no mutual consent, and he "bears the responsibility of that." That statement alone supports the Panel's finding of his responsibility for the violation. The Opening Statement continues: "I have learned now that what I did, in terms of unprotected sex, was irresponsible and unwise." That is another admission of his responsibility for a violation. It is common for people accused of wrongdoing to express remorse after the fact; but it does not mean that there was no transgression in the first place. Nor does it mean that the transgression should not be punished. Mr. Doe revealed in his Opening Statement that he had been sexually assaulted during his first year at Yale. This should have made him particularly careful to avoid engaging in sexual activity for which he had no consent. In short, Mr. Doe's own written statement to the UWC Panel provides very strong support for the Panel's

2

conclusion that he "bears responsibility for" engaging in unprotected intercourse without consent.

In Paragraph 11 of the Declaration, plaintiff states that Yale violated its procedures by failing to disclose whether or not the UWC Panel was unanimous and by failing to recommend a penalty to the Dean of Yale College, who was the decision maker. In fact, there is nothing in Yale's UWC Procedures requiring that the parties be notified of the number of panel members who supported the outcome; to the contrary, Section 7.5 of the UWC Procedures specifically states that it must be a "secret ballot." Thus, the panel members themselves do not know which members voted in the majority. In this case, the vote was unanimous, as previously mentioned in defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

Plaintiff's Declaration also claims that the Panel did not recommend a penalty to the Dean who would be making the final decision. In fact, the evidence, both documentary and testimonial, will demonstrate that the Panel did make a recommendation on the penalty, and that was the penalty imposed by Dean Chun.[1] There is nothing in the UWC Procedures which requires the parties to be told of the recommendation prior to the time the Dean renders his decision. In fact, Section 7.5 specifically states that the UWC Secretary will inform the parties only of the panel's findings of fact and conclusions. The parties learn of the sanction from the Dean.

---

[1] Under the rules, the Dean must accept the findings and conclusions of the UWC Panel, but he need not accept the penalty. In this case, he accepted both.

In Paragraph 18 of the Declaration, the plaintiff claims that Ms. Roe "specifically stated she never gave me any indication she did not consent" to the unprotected intercourse. This is false. As the plaintiff well knows, Ms. Roe stated in writing, and testified at the panel hearing, that when the unprotected intercourse occurred, she was startled and surprised.  She stopped kissing the plaintiff and "froze." As already discussed in the defendants' prior briefs, this is a very common reaction of women who are the victims of sexual assault by a known assailant. When Mr. Doe observed the plaintiff's reaction to his sudden, unannounced, and unprotected intercourse, he then withdrew, obviously recognizing that what he had done was wrong.  While he recognized the wrongfulness of his conduct and stopped after the fact, it does not in any way excuse the violation.

Paragraph 23 of the Declaration is the most disturbing, and calls into serious question the credibility of the plaintiff.  Specifically, the plaintiff has declared, under oath, the following: "Dean Angela Gleason keeps contacting me by email and text which is distressing to me every time I see correspondence from Yale administrators."  (Emphasis added.)  Dean Gleason in fact sent one email to plaintiff on Sunday, April 28, 2019 to inform the plaintiff that his request to continue his therapy at Yale Health had been granted. (Exhibit A.) When she did not hear from him, she then texted him at 11:05 p.m. the following day, simply to make sure he had received the email. (Exhibit B.) There is no evidence that she "keeps" contacting Mr. Doe.  A review of Ms. Gleason's text message shows that Mr. Doe did not respond to the text when it was sent on April 29. That is the reason the bottom portion of Exhibit B is blank. Instead, he waited until approximately an hour after he had filed his Declaration in this case to

text Dean Gleason and tell her how upset the message she had sent granting him his request to continue his therapy had made him. The timing of the Declaration and the text professing to be angry—about being told that his request for continuation of his therapy was granted— makes it difficult to escape the conclusion that the Declaration and the late-arriving text message to Dean Gleason are both fabrications designed to prop up a failing application for preliminary relief.

Dean Gleason's email and text with the plaintiff related solely to his request to continue seeing his therapist; there was no reference to this lawsuit. Dean Gleason, being unaware that the plaintiff should have been allowed to stay on the Yale Health medical plan for thirty days after his suspension, initially told him that he would not be able to see his therapist at Yale Health immediately upon his suspension on March 26. She later learned that that was an error, and told him he could resume his treatment at Yale Health. The medical coverage under the insurance policy ceased on April 25, 2019, 30 days after the suspension. Defense counsel was informed by plaintiff's counsel on Friday, April 26 that his client was suffering due to the inability to see his therapist. Defense counsel then contacted the Yale administration over the weekend; and it was determined that an exception should be made for the plaintiff such that he should be allowed to continue with his therapy. That message was communicated to the plaintiff by email on the day the decision was made, Sunday, April 28, 2019. (Exhibit A.) When she didn't hear back from the plaintiff, Dean Gleason sent a text message to ensure that the plaintiff had received her email, since she wanted to make sure that he was aware that he could continue his psychiatric care without interruption. (Exhibit B.)

5

This is something that Dean Gleason does with every time-sensitive communication she has with any of her students; she sends them a reminder.

There was no effort on the part of Yale to conceal Ms. Gleason's communications from the plaintiff's lawyers. To the contrary, defense counsel sent an email to both of plaintiff's lawyers informing them that Dean Gleason had granted the request that he be allowed to continue seeing his psychiatrist, for the specific purpose of making sure that the plaintiff was aware of it.  As pointed out in that email, defendants had no way of knowing whether the plaintiff, who was no longer enrolled, was monitoring his email. (Exhibit C.)

Ms. Gleason's communications can hardly be described as "the intentional inflection of emotional distress."  The plaintiff had told Dean Gleason that he wished to continue seeing his therapist; she emailed him to tell him his request had been granted. Even if it could somehow be believed that Ms. Gleason's email has in fact caused the plaintiff emotional distress, Ms. Gleason could not have known that the plaintiff would experience emotional distress from receiving news that he could return to see his psychiatrist, something he had requested from her. Once plaintiff's counsel advised defense counsel that Mr. Doe desired no further communications from Dean Gleason, she has not contacted him.

It is apparent from the email chain between counsel for the defendants that the plaintiff's emotional distress occurred only after his counsel saw an opportunity to use it to his advantage in this lawsuit.  Thereafter, plaintiff's counsel saw fit to make unreasonable and untrue accusations, including the claim that multiple "representatives" of Yale had contacted his client. (See Exhibit B.)

6

Given the tone and content of Dean Gleason's email and text, it is impossible to believe that anyone could have found them "distressing." Even if one were to engage in an extraordinarily willful suspension of disbelief and, somehow, credit the plaintiff's claim in this regard, his remedy is to seek money damages for that emotional distress. The plaintiff has still failed to demonstrate any irreparable harm in this matter.

## CONCLUSION

When this matter was decided by the UWC Panel, the principal issue was which of the parties had more credibility. The representations made in the plaintiff's Declaration do not in any way support the contention that he is suffering from irreparable harm; but the Declaration certainly does further damage to the credibility of Mr. Doe. For the reasons stated in the defendants' opposition memoranda, the plaintiff's motion for a temporary restraining order and for a preliminary injunction should be denied.

**THE DEFENDANTS,**
**YALE UNIVERSITY, MARVIN CHUN, JOHN MAYES, JORDAN PILANT, MARIA PINANGO, MARK SOLOMON, JORDON WHITE AND ANGELA GLEASON**

BY: /s/ Patrick M. Noonan  (#ct00189)
Patrick M. Noonan
Donahue, Durham & Noonan, P.C.
741 Boston Post Road
Guilford, CT 06437
(203) 458-9168

## **CERTIFICATION**

      I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                              /s/
                         Patrick M. Noonan